THE STATE OF OHIO, APPELLEE, v. GAPEN, APPELLANT.

[Cite as *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548.]

(No. 2001–1518—Submitted August 17, 2004—Decided December 15, 2004.)

LUNDBERG STRATTON, J.

{¶ 1} In this death-penalty appeal, defendant-appellant, Larry James Gapen, raises 14 propositions of law. We find one proposition to be meritorious and reverse Gapen's convictions for breaking detention and the R.C. 2929.04(A)(4) specifications that allege murder in the course of breaking detention. We find that none of his other propositions of law has merit and affirm Gapen's remaining convictions. We have also independently weighed the aggravating circumstances against the mitigating factors and have compared Gapen's sentence of death to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm Gapen's sentence of death.

{¶ 2} Larry James Gapen was distraught over the recent dissolution of his marriage to Martha Madewell. Around 1:00 a.m. on September 18, 2000, Gapen entered Madewell's home in Dayton. Gapen found Madewell and Nathan Marshall, a former husband of Madewell, lying on a couch. Gapen killed them by repeatedly striking them with a maul. Gapen then went upstairs and struck 13–year–old Jesica Young with the maul as she slept in her bed. Jesica later died of her injuries.

{¶ 3} Gapen was convicted of the aggravated murders of Madewell, Marshall, and Jesica and was sentenced to death for Jesica's murder. To establish Gapen's guilt, the state introduced Gapen's statements to the police, DNA evidence that Gapen's sperm was found on Madewell's right leg, abdomen, and rectum, testimony from two children in the house at the time of the murders, and evidence that Madewell's purse was found in Gapen's car at the time of his arrest.

*State's Case*

{¶ 4} During the fall of 1999, Gapen and Madewell separated, and Gapen and his son, Jimmy, moved out of the family home in Huber Heights. In March 2000,

Gapen and Jimmy moved to the apartment of Charity, his daughter, who lived on Brusman Drive in Vandalia. Around June or July 2000, Madewell and her children, Jesica Young, Daniel Marshall, Billy Madewell, and Brooke Madewell, moved to Pheasant Hill Road in Dayton.

{¶ 5} On July 5, 2000, Gapen was indicted for the abduction of Madewell. According to Gapen, this incident occurred because he "wanted to talk to [Madewell] one time about the whole situation," and "he was afraid she would just walk out on him so he tied her legs up so she couldn't leave."

{¶ 6} Two days before, Gapen had been released from jail on a cash bond of $10,000 and under supervision from an electronic home-detention program ("EHDP"). On July 3, 2000, Gapen received an ankle bracelet and started electronic home detention at his daughter's apartment. On July 19, 2000, Gapen was granted work-release privileges to continue working as a truck driver for Federal Express.

{¶ 7} During August and September, Gapen remained in contact with Madewell. Gapen took Madewell and her children to the Ohio State Fair in August 2000 and attended a cookout at Madewell's home over the Labor Day weekend, both violations of his home detention, and Madewell visited Gapen at his residence.

{¶ 8} On September 14, 2000, the marriage of Gapen and Madewell was dissolved. At dinner on Saturday, September 16, Gapen told Heather Morgan, a friend, that he was divorced but indicated that he did not want to discuss the matter. He was wearing his wedding ring. Gapen expressed hope that "after Martha had been out for a while * * * she would see that [he] was really a good thing for her and * * * they could get back together." Around 3:00 p.m. on Sunday, September 17, Gapen mentioned to Morgan on the telephone that he still loved Madewell, did not understand why Madewell "didn't want to talk" with him, and felt "she had someone else in her life."

{¶ 9} According to Gapen, around 7:30 p.m. on September 17, he drove to Madewell's home, entered through an unlocked back door, and announced his presence. After failing to get a response, Gapen walked through the residence and saw Madewell and an unknown man lying on a couch. Gapen said, "I didn't let them know I was there" and "I just walked out the same way I came in."

{¶ 10} Around 8 or 9 p.m. on September 17, Gapen met Jimmy, his son, and Kacee Miller, Jimmy's girlfriend, at a Huber Heights restaurant. Gapen was sitting at the bar drinking a "beer and a shot of something." According to Miller, Gapen talked about Madewell and mentioned that "he knew that Martha had a boyfriend, but he was okay with it."

{¶ 11} Gapen returned to Madewell's home around 12:30 a.m. on September 18, parked behind the garage, and entered through the unlocked back door. He brought a maul (also referred to as an "axe-maul") and a pair of work gloves with him. Gapen found Madewell and Marshall "passed out on the couch" in the basement. Gapen then repeatedly struck Madewell and Marshall with the maul, and after he finished hitting them, he "had sex with Martha."

{¶ 12} At this time, eight-year-old Brooke was sleeping in a basement bedroom and was awakened by loud banging noises and her mother's cries. Brooke opened her bedroom door and saw a man with "a long stick that looked like an axe." Brooke then saw that Gapen was holding the "axe" and was hitting "something." When Gapen saw Brooke, he told her, "Go back to bed."

{¶ 13} After this attack, Gapen went to the second-floor bedroom of Jesica. While she was asleep, Gapen struck Jesica repeatedly with the maul. Before leaving the upstairs, Gapen found seven-year-old Billy sleeping in the master bedroom. Gapen woke up Billy, took him to his car, and put him in the back seat.

{¶ 14} Gapen then returned to the basement and told Brooke to get dressed because her mother had called him to take her and Billy to school, as she needed a rest. Before leaving, Brooke went upstairs to see Jesica. As Brooke approached Jesica's room, Gapen told her, "Don't go in there."

{¶ 15} Daniel, age 17, woke up at 1:51 a.m. after hearing Jesica's cries from her adjoining bedroom. While Gapen was on the second floor, Daniel opened his bedroom door, and Gapen was standing in front of it. Gapen told Daniel that his mother "was taking care of [his] sister. She'd gotten in some trouble in her room, and he was sorry for waking [him] up." Gapen told Daniel to "go back to sleep," and Daniel returned to bed.

{¶ 16} Gapen then left the house with Brooke. They walked to Gapen's car, and Brooke got into the back seat with Billy. Gapen went back inside and changed into clean clothes that he had brought with him. Gapen then returned to the car and drove off with the two children.

{¶ 17} After Gapen left, Daniel went to the basement to check on Brooke and discovered the bodies of Madewell and Marshall. Daniel then went upstairs to check on Jesica and found her "laying there with her face * * * split open, teeth * * * knocked out, [and] her braces were sticking out of her mouth. * * * [S]he was trying to talk * * * but it just wasn't coming out." Daniel also discovered that Brooke and Billy were gone. Daniel notified the police.

{¶ 18} Police and emergency medical personnel responding to the 911 call entered Madewell's home and found Jesica's battered body upstairs. Jesica was still alive and was rushed to a hospital, where she later died.

{¶ 19} Police then found Madewell's and Marshall's bodies in the basement. Madewell was lying on her back underneath a coffee table. Two blankets covered her entire body up to her neck, and a rug had been placed below her face. Madewell's shirt and bra had been pulled up above her chest. Otherwise, Madewell's body was nude, and her legs had been spread apart. Police found Marshall's body lying on the couch with a blanket over the top half of his body.

{¶ 20} Police secured the crime scene and collected evidence from Madewell's home. Police found a glove at the end of the basement couch that had hair intertwined in it. The matching glove was found in the kitchen.

{¶ 21} In Jesica's room, police found Jesica's bed, comforter, and sheets covered in blood. Five teeth were found in the folds of the bed sheets and on the floor. There were also multiple areas of "slow to medium velocity" blood spatter along the wall. Dayton Detective Gary Dunsky testified that the velocity of the spattering was consistent with the use of a maul or hammer to strike the victim.

{¶ 22} Police found a "splitting maul" in the upstairs bathroom next to Jesica's room. The steel part of the maul was "covered completely" with blood.

{¶ 23} The police quickly determined that Gapen was their primary suspect and broadcast his name and description, as well as information about the missing children, to law enforcement agencies. For several hours after fleeing the scene, Gapen drove around the Dayton area with the two children. Gapen disposed of his bloody clothing along Interstate 75.

{¶ 24} Around 7:00 a.m. on September 18, Deputy U.S. Marshal Michael Penland identified Gapen and the two children when Gapen showed up at his Brusman Drive residence. Shortly thereafter, Deputy Penland and Vandalia Patrolman Rodney Millhouse arrested Gapen. The two children were released unharmed.

{¶ 25} During his arrest, Gapen said, "I know what this is about, just take care of the kids." Once in the police cruiser, Gapen said to Officer Millhouse, "I know what you are doing. I just wanted you to know that the kids were in the car."

{¶ 26} Around 8:30 a.m. on September 18, Dayton Detectives Mark Salyer and William Elzholz advised Gapen of his *Miranda* rights and interviewed him. Gapen provided a detailed confession, which reflected the facts already described. In explaining his actions, Gapen said, "This has been building and building for months." Madewell had been "playing him," and he "wasn't going to take it anymore." Gapen said he was "not sorry" for what he had done, and this was the best he had felt in weeks. According to Gapen, he felt as if a weight had been lifted from him, and "they were not going to hurt anyone any more."

{¶ 27} During his confession, Gapen indicated that he did not know Marshall's identity before killing him. When asked why he killed Jesica, Gapen said that

"Jesica had always disrespected him and that she would talk back to him. She would smoke in the house, drink in the house, and * * * never give him any respect * * *." Gapen then said, "She was going to turn out just like them." When asked why he did not attack Daniel, Gapen said, "Danny doesn't know how lucky he is."

{¶ 28} On September 21, the police searched Gapen's car and found Madewell's purse on the front passenger seat. The purse contained numerous items, including Madewell's credit cards, her paycheck, a child-support check, and 35 cents in change. Additionally, a copy of the dissolution decree of Gapen and Madewell's marriage was on the front passenger seat.

{¶ 29} Dr. Kent Harshbarger, Deputy Coroner for Montgomery County, performed autopsies on the three victims. Jesica suffered 17 chop wounds, five blunt-force injuries on her chest and chin, eight blunt-force injuries on her upper extremities, and two blunt-force injuries on her legs. Some of Jesica's teeth and fragments of her braces were recovered from her stomach. Dr. Harshbarger concluded that Jesica had died from "multiple chop injuries of the head and chest."

{¶ 30} Madewell, who was 37 years old, received "at least ten chop wounds." According to Dr. Harshbarger, Madewell's cause of death was "multiple chop wounds of the head." She died a "little before two o'clock in the morning" on September 18. Dr. Harshbarger also testified that Madewell's bra was "torn at the clasp, and * * * the fabric at the seam was * * * torn as well."

{¶ 31} Marshall suffered 18 chop wounds, including two defensive wounds on his right arm, and he died as the result of "[m]ultiple chop injuries of the head." Finally, Dr. Harshbarger concluded that the maul found at the crime scene could have caused the wounds suffered by all three victims.

{¶ 32} At trial, David Smith, a serologist and DNA analyst, testified that DNA testing of blood samples from the maul showed a "mixture." However, a major component of the mixture was blood "consistent with that of Jesica Young." Additionally, DNA testing of a blood sample from the external portion of the left-handed work glove "was a mixture. The major component was consistent with that of Martha Madewell." However, "Jesica Young could not be excluded as a contributor to the minor component." DNA testing of the left-glove liner "was a mixture again. Larry Gapen could not be excluded as a possible donor to this mixture." Finally, DNA testing of the right glove indicated that Madewell or Young could be contributors.

{¶ 33} Smith also testified that DNA testing of a rectal sample taken from Madewell was a "mixture," but the major component was from Larry Gapen. Microscopic analysis of a swab sample obtained from Madewell's right leg revealed the presence of sperm. Additionally, both chemical and microscopic

analysis of swab samples obtained from Madewell's abdomen showed the presence of sperm. DNA testing of the sperm showed that "the DNA profile obtained from the right leg and the abdomen were consistent with that of Larry Gapen."

### Defense Case

{¶ 34} Linda Shipley and Jonathan Boeckman, Montgomery County pretrial services employees, obtained information about Gapen's background in preparing a bond recommendation on the abduction charge. Gapen reported to Shipley that he had not been diagnosed with any mental health problems, had never taken any psychotropic drugs, and had used alcohol socially. Boeckman verified that the abduction charge was Gapen's first arrest, and he had no prior criminal record.

{¶ 35} Charity Gapen, the defendant's then 22–year–old daughter, testified that Madewell called Gapen after he was placed on electronic home detention in July 2000. After the first two weeks of home detention, Gapen and Madewell began talking daily, and Madewell "started coming to [the] apartment and seeing him * * * and from there, he would go and see her." Madewell and Gapen also ate out together. During this period, Gapen started to "drink more at home." During mid-September, Gapen mentioned that he hoped to work out his problems with Madewell, and even after the dissolution, he "hoped that they at some time would get back together."

{¶ 36} Jimmy Gapen testified that Gapen seemed "really upset" and was "really worried about something" on the morning of September 17. However, when Jimmy and his girlfriend had dinner with Gapen at 8:00 p.m., Gapen "seemed very happy." During the early morning hours of September 18, Gapen woke Jimmy up and told him that he was "in trouble with the police and * * * was going to go away for a while." During cross-examination, Jimmy confirmed that Gapen had a maul to chop wood when the family lived in Huber Heights.

{¶ 37} Patrick Mulligan, Gapen's defense attorney for the abduction offenses, testified that Gapen had been charged with abduction and a misdemeanor charge of domestic violence for the June 24, 2000 incident involving Madewell. According to Mulligan, the abduction charge was still pending, and the domestic-violence charge was pending on appeal.

{¶ 38} Steven Menard, a friend and fellow coach on youth baseball and football teams, characterized Gapen's relationship with Madewell as "on-again, off-again."

### Trial Result

{¶ 39} Gapen was charged with 12 counts of aggravated murder and four related felonies. Despite pleas of not guilty, Gapen was found guilty of all

charges except rape. He was sentenced to death for Jesica's murder. The following chart summarizes all charges and sentences.

| Charge | Verdict | Jury Rec. | Sentence |
|---|---|---|---|
| 1. Breaking detention | Guilty | | 5 years |
| 2. Agg. burglary | Guilty | | 10 years |
| 3. Rape (Martha Madewell) | Not Guilty | | N/A |
| 4. Agg. robbery | Guilty | | 10 years |
| 5. Agg. murder of Marshall w/prior calc. & design + R.C. 2929.04(A)(4) (breaking detention), (A)(5) (course of conduct), & three (A)(7) specifications: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole | Life w/out parole (counts 5–8 merged) |
| 6. Agg. felony-murder of Marshall (agg. burglary) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole | |
| 7. Agg. felony-murder of Marshall (rape) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole | |
| 8. Agg. felony-murder of Marshall (robbery) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole | |
| 9. Agg. murder of Madewell w/prior calc. & design + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole | Life w/out parole (counts 9–12 merged) |
| 10. Agg. felony-murder of Madewell (burglary) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole | |
| 11. Agg. felony-murder of Madewell (rape) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole | |
| 12. Agg. felony-murder of Madewell (robbery) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole | |
| 13. Agg. murder of Young w/prior cal. & design + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Death | Death (counts 13–16 merged) |
| 14. Agg. felony-murder of Young (burglary) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course | Guilty | Life w/out parole | |

| of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | | |
|---|---|---|
| 15. Agg. felony-murder of Young (rape) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole |
| 16. Agg. felony-murder of Young (robbery) + R.C. 2929.04(A)(4) (breaking det.), (A)(5) (course of conduct), & three (A)(7) specs.: (agg. burglary, rape, & agg. robbery) | Guilty | Life w/out parole |

{¶ 40} Gapen now appeals directly to this court as a matter of right.

## Pretrial Issues

{¶ 41} *Miranda compliance.* In proposition of law VII, Gapen argues that his statements and confession to the police were improperly admitted in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, after he invoked his right to silence and his right to counsel. The trial court overruled the defense motion to suppress and admitted, excluding a few statements, Gapen's confession into evidence.

{¶ 42} During the suppression hearing, Vandalia police officer Millhouse testified that around 8:00 a.m. on September 18, he drove Gapen to the Dayton police station in his cruiser. Although Millhouse did not question Gapen on the way to the station, Gapen said that he "didn't want to talk about anything." Millhouse did not tell detectives at the police station that Gapen had said that he did not want to talk.

{¶ 43} Around 8:30 a.m., Detectives Mark Salyer and William Elzholz interviewed Gapen. Detective Salyer advised Gapen of his *Miranda* rights, using a preinterview form. Gapen acknowledged his rights by placing his initials next to each of his rights on the form, but he refused to sign the form. Gapen then said, "I prefer not to say anything at this time. Maybe later. I have a lawyer."

{¶ 44} After Gapen invoked his Fifth Amendment rights, Detectives Salyer and Elzholz stood up and prepared to leave the interview room. Gapen then said, "Can I ask you guys a question?" Detective Salyer said, "Yeah," and Gapen asked, "Are the kids being taken care of, especially the little girl?" Detective Salyer replied, "As far as I know, they're being taken care of, but is there a reason we should know about the girl? Is there some reason * * * she may need help?" Gapen then said, "It was pretty bad over there. I don't know what she saw or what she heard. It was real bad over there." Without being asked any further questions, Gapen said, "You don't know the whole story. This did not happen just over one night. This has been building and building for months." Without further prompting, Gapen kept talking and provided a detailed oral statement confessing to the murders of Madewell and Marshall.

{¶ 45} After Gapen's initial confession, Detective Elzhoz said, "Larry I'd like to ask you something, and you certainly don't have to answer if you don't want to. You know, it's entirely up to you." Gapen replied, "I won't answer anything if I don't want to." Detective Elzholz then asked, "Did you leave her like that?" Gapen then described how he had beaten Madewell with the maul and then had had sex with her.

{¶ 46} As the interview progressed, Detective Salyer asked Gapen three or four questions, and Detective Elzholz asked him "four questions total." In response to these questions, Gapen explained his reasons for attacking Young, admitted bringing the maul and work gloves from his house to the murder scene, and provided other details about the murders.

{¶ 47} Following one question, Gapen said, "All I wanted to do was find out how the kids were doing. Look where I'm at now because I've told you everything. I know my freedom's over, * * * [b]ut I'm not sorry about this. I haven't felt this well * * * in weeks." At the end of the interview, Gapen shook hands with the detectives, and said, "I want to thank you for the way you treated me."

{¶ 48} The facts show that Gapen's police statements were not obtained in violation of his *Miranda* rights. First, Gapen's confession was not improperly obtained simply because he told Officer Millwood that he "didn't want to talk about anything" while being transported in a cruiser to the police station. At most, Gapen's statement was an anticipatory assertion of his rights because he was not being interrogated when he made this comment.

{¶ 49} Federal courts have held that *Miranda* rights may not be anticipatorily asserted but may only be invoked in the context of custodial interrogation. See *United States v. LaGrone* (C.A.7, 1994), 43 F.3d 332, 339 ("in order for a defendant to invoke his *Miranda* rights the authorities must be conducting interrogation, or interrogation must be imminent"); *Alston v. Redman* (C.A.3, 1994), 34 F.3d 1237, 1246 ("To allow an individual to interpose *Miranda* [require-ments] in a situation outside the custodial interrogation context would represent an unwarranted extension of *Miranda's* procedural safeguards * * *"); *United States v. Grimes* (C.A.11, 1998), 142 F.3d 1342, 1348 ("*Miranda* rights may be invoked only during custodial interrogation or when interrogation is imminent"). The United States Supreme Court has not squarely addressed this issue. But, see, *McNeil v. Wisconsin* (1991), 501 U.S. 171, 182, 111 S.Ct. 2204, 115 L.Ed.2d 158, fn. 3: "Most rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interroga-tion does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect."

{¶ 50} The reasons for not recognizing an anticipatory assertion of *Miranda* rights are persuasive. As stated in *LaGrone*, 43 F.3d at 339–340, the requirement that a defendant must invoke his *Miranda* rights when the police are conducting an interrogation or interrogation is imminent "advances the twin goals of *Miranda:* providing an opportunity for the defendant to dissipate the compulsion and allowing law enforcement the ability to conduct investigations." Moreover, prohibiting a defendant from invoking his *Miranda* rights anticipatorily "does not place an arduous burden on the defendant—all he needs to do is invoke his right in response to or just before interrogation." Based on this authority and reasoning, we find that Gapen did not invoke his *Miranda* right to remain silent while riding in the back of the police cruiser.

{¶ 51} Second, the police did not improperly obtain Gapen's confession during questioning, because Gapen initiated further discussion about the crime after invoking his *Miranda* rights. Under *Edwards v. Arizona* (1981), 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378, once Gapen asserted his *Miranda* rights, no further interrogation was permissible unless Gapen himself initiated "further communication, exchanges, or conversations with the police." Gapen initiated further conversation by asking the detectives before they left the interview room, "Can I ask you guys a question?" and "Are the kids being taken care of, especially the little girl?" Here, the police did not prompt Gapen to continue talking to them about the crime. Rather, Gapen "evinced a willingness and a desire" to talk further about the crime and its effect upon the well-being of Brooke Madewell. *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1045–1046, 103 S.Ct. 2830, 77 L.Ed.2d 405; cf. *Jacobs v. Singletary* (C.A.11, 1992), 952 F.2d 1282, 1294 (suspect did not initiate questioning by asking, "Where are my children?"). Under these circumstances, we find no *Miranda* violation.

{¶ 52} Although Gapen initiated the conversation, Detectives Salyer and Elzholz asked several follow-up questions about the murders. Thus, it is necessary to determine whether Gapen thereafter waived his Fifth Amendment rights. Such a waiver must be knowing and intelligent and found to be so under the "totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards*, 451 U.S. at 486, 101 S.Ct. 1880, 68 L.Ed.2d 378, fn. 9; see, also, *United States v. Ware* (C.A.6, 2003), 338 F.3d 476, 481.

{¶ 53} No evidence of police coercion, threats, or promises was introduced during the suppression hearing. Indeed, Detective Elzholz reminded Gapen that he did not have to answer any of his questions before asking him the first follow-up question. In responding "I won't answer anything if I don't want to," Gapen acknowledged that he understood his rights and was knowingly waiving his rights and proceeding with the police interview. Moreover, Gapen, who was 52 years

old, was mentally alert and did not appear to be under the influence of alcohol at the time of the interview. Thus, the evidence supports the finding that "[u]nder the totality of the circumstances," Gapen validly waived his rights. *State v. Nields* (2001), 93 Ohio St.3d 6, 15, 752 N.E.2d 859; see, also, *State v. Jones* (2000), 90 Ohio St.3d 403, 413, 739 N.E.2d 300.

{¶ 54} Even if the trial court improperly admitted Gapen's confession, we find that any error was harmless beyond a reasonable doubt. Here, Brooke's and Daniel's eyewitness testimony, DNA evidence linking Gapen to the murder victims, and Madewell's purse and other evidence seized from Gapen's car unquestionably established Gapen's guilt. Additionally, Gapen blurted out when he was arrested, "I know what this is about, just take care of the kids." After being placed in the cruiser, he also said, "I know what you are doing. I just wanted you to know that the kids were in the car." Police were not questioning Gapen at the time of either of these statements, and the admissibility of these volunteered admissions was not affected by any issue relating to the confession. *Arizona v. Fulminante* (1991), 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302; *State v. Brown* (1992) 65 Ohio St.3d 483, 485, 605 N.E.2d 46. Thus, we overrule proposition VII.

## Trial Issues

{¶ 55} ***Sufficiency of the death-penalty specifications and escape charge.*** In proposition of law IV, Gapen argues that his violation of electronic home monitoring imposed as a condition of his bond does not violate either R.C. 2921.34 for breaking detention or the R.C. 2929.04(A)(4) death specifications for committing murder after breaking detention.

{¶ 56} Following his arrest for abducting Madewell, Gapen was released from jail on his own recognizance on the condition of monitoring under the electronic-home-detention program ("EHDP"). He was fitted with an ankle transmitter, a monitoring device was installed on his telephone, and he began electronic home detention.

{¶ 57} On July 19, 2000, Gapen was granted work-release privileges. Beginning on July 27, 2000, Gapen was scheduled to work from 6 p.m. to 7 a.m., Monday through Friday, and from 9 a.m. to 6 p.m. on Saturday. Gapen was not allowed to go anywhere except work or home.

{¶ 58} At 12:30 a.m. on September 18, Gapen violated EHDP when he went to Madewell's condominium and committed the three murders.

{¶ 59} At the completion of the state's case, the trial court overruled a defense Crim.R. 29 motion for an acquittal on the breaking-detention charge and the R.C. 2929.04(A)(4) specifications. Over defense objection, the trial court instructed the jury that "[e]llectronically monitored home detention is a form of constraint that

includes detention. Detention facility means any public or private place used for confinement of a person charged or convicted with any crime in this state or any other state or under the laws of the United States."

{¶ 60} R.C. 2921.34(A)(1), the escape statute, provides:

{¶ 61} "No person, knowing the person is under detention * * * shall purposely break or attempt to break the detention, or purposely fail to return to detention * * *."

{¶ 62} R.C. 2929.04(A)(4), the relevant death-penalty specification, states, "The offense [of aggravated murder] was committed while the offender was under detention or while the offender was at large after having broken detention. As used in division (A)(4) of this section, 'detention' has the same meaning as in section 2921.01 of the Revised Code * * *."

{¶ 63} R.C. 2921.01(E) defines detention:

{¶ 64} " 'Detention' means arrest; confinement in any vehicle subsequent to an arrest; confinement in any public or private facility for custody of persons charged with or convicted of crime in this state or another state or under the laws of the United States * * *."

{¶ 65} Although electronic home monitoring is not included within the definition of detention, the state argues that pretrial electronic home monitoring is detention because detention includes confinement in any "private facility for custody of persons charged with * * * crime." For the following reasons, we reject this argument.

{¶ 66} First, the statutory history of R.C. 2921.01(E) indicates that the General Assembly did not intend to include pretrial electronic home monitoring in the definition of detention. For example, a former version of R.C. 2921.01(E), effective on July 1, 1996, specifically defined pretrial electronic home monitoring as a form of detention. See Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, 7335. However, R.C. 2921.01(E) was amended, effective October 4, 1996, and the General Assembly deleted the reference to electronic home monitoring from the definition of detention. See Sub.H.B. No. 154, 146 Ohio Laws, Part II, 2213, 2214.

{¶ 67} Second, electronic home monitoring was separately defined in Ohio's sentencing statute. Former R.C. 2929.23, Am.Sub.H.B. No. 22, 148 Ohio Laws, Part IV, 8353, 8383–8384, in effect on the day of the murders, see Am.Sub.H.B. No. 490, stated, " 'Electronically monitored house arrest' means a period of confinement of an eligible offender in the eligible offender's home or in other premises specified by the sentencing court * * *." R.C. 2929.23(A)(4). An "[e]ligible offender" was defined as a "person who has been *convicted of or pleaded guilty to any offense*" excluding exceptions not applicable here. (Empha-

sis added.) R.C. 2929.23(A)(3). Thus, "[f]ormer R.C. 2929.23 focused on those serving terms of incarceration and did not apply to those on electronic monitoring as a condition of bail under Crim.R. 46." See *State v. Sutton*, Lucas App. No. L–03–1104, 2004-Ohio-2679, 2004 WL 1171149, ¶ 10.

{¶ 68} Third, Ohio courts of appeals have generally held that persons under *pretrial* electronic home monitoring are not entitled to credit for time served, because pretrial electronic home monitoring is a "constraint in lieu of bail pursuant to R.C. 2967.191" and is not detention under R.C. 2921.01(E). See *State v. Faulkner* (1995) 102 Ohio App.3d 602, 604, 657 N.E.2d 602; *State v. Studer* (Mar. 5, 2001), Stark App. No. 2000CA00180, 2001 WL 246416, * 2; *Bailey v. Chance* (Sept. 18, 1998), Mahoning App. No. 98 CA 169, 1998 WL 666965, * 3; *State v. Setting* (Mar. 20, 1996), Wayne App. No. 95CA0057, 1996 WL 122094, * 3. Similarly, Ohio courts of appeals have held that persons under *pretrial* electronic home monitoring are not entitled to credit for speedy-trial purposes because pretrial electronic home monitoring does not constitute detention. *State v. Truesdale* (Dec. 15, 1995), Montgomery App. No. 15174, 1995 WL 738418, * 2; *State v. Brownlow* (1991), 75 Ohio App.3d 88, 92, 598 N.E.2d 888.

{¶ 69} Recently, an appellate court has held that a person cannot be convicted of escape for violating *pretrial* electronic home monitoring. *Sutton*, Lucas App. No. L–03–1104, 2004-Ohio-2679, ¶ 17. The court's rationale was based on the fact that pretrial electronic home monitoring was not detention, but a condition of bond, and "[w]ithout detention, one cannot be convicted of escape." The court also stated that this decision "logically follow[s] from treatment of pre-trial electronic monitoring for the purposes of credit for time served and speedy trial." Id. Contra *State v. West* (Aug. 21, 1998), Montgomery App. No. 16888, 1998 WL 639290, * 2 (holding that pretrial electronic monitoring is a form of detention for purposes of the crime of escape).

{¶ 70} The state claims that *State v. Snowder* (1999), 87 Ohio St.3d 335, 720 N.E.2d 909, justifies sustaining Gapen's convictions. Snowder's conviction for escape from a community-based correctional facility ("CBCF") was upheld even though he did not receive credit for time served at the CBCF. However, *Snowder* is inapposite. Snowder was a *sentenced* prisoner serving time at the CBCF as a condition of probation, not pretrial release. Thus, unlike Gapen, Snowder could be found guilty of escaping detention.

{¶ 71} Finally, our recent ruling in *State v. Thompson*, 102 Ohio St.3d 287, 2004-Ohio-2946, 809 N.E.2d 1134, does not apply to the facts in this case. *Thompson* addressed the issue of whether a parole violator could be charged with escape under R.C. 2921.34. That decision dealt with a statutory change to R.C. 2921.01(E) and had nothing to do with electronic home monitoring.

{¶ 72} In sum, we find that pretrial electronic home monitoring was not intended to be a form of detention under R.C. 2921.01(E). Thus, we hold that pretrial electronic home monitoring does not constitute detention for the purpose of prosecuting the crime of escape, nor does it satisfy the requirements of proof in R.C. 2929.04(A)(4).

{¶ 73} We find that proposition IV has merit. Accordingly, Gapen's conviction for escape and the guilty findings on the R.C. 2929.04(A)(4) specifications are vacated. The charge and specifications are dismissed.

{¶ 74} *Guilt-phase instructions.* Noting that he was acquitted of rape, in proposition of law V, Gapen argues that the trial court's failure to instruct the jury on the elements of attempted rape requires that his convictions of the R.C. 2929.04(A)(7) death specifications for aggravated murder while committing or attempting to commit rape should be vacated. However, Gapen did not request an instruction on attempted rape or object to the trial court's failure to give instructions on attempted rape. Thus, Gapen has waived all but plain error. Crim.R. 30(A); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraphs one and two of the syllabus.

{¶ 75} Instructions to a jury "may not be judged in artificial isolation but must be viewed in the context of the overall charge." *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Taken as a whole, we find that the trial court's instructions effectively advised the jury on attempted rape.

{¶ 76} First, as to each of the R.C. 2929.04(A)(7) rape specifications, the jury was instructed that it must find that "the aggravated murder was committed while the Defendant was committing or *attempting to commit* or in fleeing immediately after committing or *attempting to commit* the offense of rape." (Emphasis added.) Although Gapen has not challenged the instructions on felony-murder rape in Counts VII, XI, and XV, the jury was instructed on each of these counts that "[b]efore you can find the Defendant guilty, you must find * * * the Defendant purposely caused the death of another * * * while committing or *attempting to commit* or while fleeing immediately after committing or *attempting to commit* the offense of rape." (Emphasis added.)

{¶ 77} Second, the trial court defined "attempt" for the jury. During instructions on attempted aggravated robbery that preceded instructions on the rape specifications, the trial court informed the jury that "[a]n attempt occurs when a person purposely engages in conduct that, if successful, will result in a theft offense." The trial court referred to this definition of attempt when later instructing the jury on rape in Counts VII, XI, and XV. Under these circumstances, the trial court's failure to refer to its earlier definition of attempt when

instructing the jury on the R.C. 2929.04(A)(7) rape specifications was not of crucial importance.

{¶ 78} Finally, at the conclusion of the guilt-phase instructions, the jury was advised, "The Court cannot embody all the laws in any single part of the instructions. In considering one portion, you must consider it in light and in harmony of all the instructions." Based on this instruction and the trial court's reference to the definition of attempt during its instructions on Counts VII, XI, and XV, we find that the jury was adequately instructed on attempt as it applied to the R.C. 2929.04(A)(7) rape specifications. Moreover, the trial court provided the jury with a written copy of the instructions, and the jury was able to refer to the definition of "attempt" during its deliberations.

{¶ 79} Thus, there was no plain error, and we overrule proposition V.

{¶ 80} *Gruesome photographs.* In proposition of law VIII, Gapen argues that the trial court erred in admitting gruesome autopsy and crime-scene photographs of the victims.

{¶ 81} In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 82} *Crime-scene photographs.* Gapen complains about four gruesome crime-scene photographs. The state sought to introduce 24 photos from the basement crime scene. The judge admitted 13 of these photos. However, five of these photographs were of the general basement area and did not involve photos of the victims or blood, and one of the other photographs was not used at trial.

{¶ 83} State's exhibit 88 depicts Madewell's and Marshall's bodies as they were found in the basement. During trial, the trial counsel stated that the defense had no objection to state's exhibit 88, and hence Gapen can complain only of plain error as to that exhibit. *State v. Twyford* (2002), 94 Ohio St.3d 340, 358, 763 N.E.2d 122. However, there was no plain error. This photograph illustrated the testimony of the detectives at the scene and portrayed the victims' bodies in relation to their surroundings.

{¶ 84} The trial counsel objected to the other three crime-scene photos. State's exhibit 90 depicts Madewell's body after the table over her body was removed. Madewell's body is covered by blankets, and none of her upper body or head wounds is visible. State's exhibit 102 is a close-up of Marshall's body as it was found on the couch. The body is covered with a blanket, but his head

wounds are visible in the photograph. State's exhibit 105 is a close-up of the wounds on Marshall's right forearm.

{¶ 85} The trial court did not abuse its discretion in admitting these few selected photographs. State's exhibit 90 presented a view of Madewell's body that is not particularly gruesome and was relevant in showing the position of her body at the crime scene. State's exhibits 102 and 105 depicted the wounds inflicted on Marshall and helped to prove Gapen's intent and lack of accident or mistake. See *Twyford*, 94 Ohio St.3d at 358, 763 N.E.2d 122; *State v. Hartman* (2001), 93 Ohio St.3d 274, 288, 754 N.E.2d 1150. Moreover, these photos gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042.

{¶ 86} *Autopsy photographs.* Over defense objection, the prosecutor sought to introduce 82 autopsy slides of the three victims. However, the trial court permitted the admission of only six autopsy slides per victim. Subsequently, duplicate photographs were made of the slides, and the photographs were introduced into evidence in place of the slides.

{¶ 87} State's exhibit 1A depicts Jesica's body prior to the autopsy. This photograph shows wounds to Jesica's jaw and showed the location of chop wounds on her right lower leg. State's exhibit 14A shows a skull fracture underneath a large chop wound on Jesica's scalp, and state's exhibit 22A shows a chop wound above her left ear. State's exhibit 26A depicts chop wounds and extensive swelling of Jesica's face and tongue, and state's exhibit 29A is an inside view of Jesica's mouth, showing a broken jaw, missing teeth, and fragments of braces. Finally, state's exhibit 35A shows chop wounds on Jesica's upper chest and neck area.

{¶ 88} State's exhibit 41A is a decidedly gruesome photograph showing Madewell's body at the coroner's office. This photograph depicts extensive wounds to her face and neck. Moreover, this photograph shows that her shirt and bra had been pushed above her breasts and helped to prove attempted rape. State's exhibits 43A and 47A show chop wounds on the face and neck areas. State's exhibits 48A and 50A show multiple chop wounds to the back of Madewell's head. Finally, state's exhibit 57A depicts swelling on the underside of the brain, indicating that Madewell was alive for a period of time after the beating began. This photo also shows a chop wound of the brain stem that was a fatal injury.

{¶ 89} State's exhibit 62A is another gruesome photograph showing Marshall's body at the coroner's office. The photograph shows that Marshall suffered massive head and chest injuries. State's exhibits 65A, 72A, and 74A show multiple chop wounds to Marshall's face and neck. State's exhibit 79A shows that he also received chop wounds to his chest. Finally, state's exhibit 81 depicts lacerations of the liver caused by the chop wounds on Marshall's chest.

{¶ 90} The trial court did not abuse its discretion in admitting any of the autopsy photographs of the three victims. The 18 autopsy photos were limited in number, noncumulative, and had substantial probative value and relevance. Each of these photos illustrated the coroner's testimony and demonstrated Gapen's specific intent to kill. See *Hartman,* 93 Ohio St.3d at 289, 754 N.E.2d 1150; *State v. Goodwin* (1999), 84 Ohio St.3d 331, 342, 703 N.E.2d 1251.

{¶ 91} During the penalty phase, the trial counsel did not object to the reintroduction of the photographs into evidence, and the trial court did not commit plain error by allowing these photographs into evidence. See *Twyford,* 94 Ohio St.3d at 358, 763 N.E.2d 122; *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542. Based on the foregoing, we overrule proposition VIII.

{¶ 92} ***Prosecutorial misconduct.*** In proposition of law XII, Gapen argues that the prosecutor committed misconduct during the guilt-phase closing argument. The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14–15, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 93} ***Vouching.*** Gapen complains that during rebuttal argument, the prosecutor vouched for the truthfulness of the testimony of Detective Mark Salyer by stating: "You think that Detective Mark Salyer is going to get on the stand and tell you things that aren't true? He's going to get up here and perjure himself? You know the police are not on trial here. Detective Mark Salyer is not on trial. * * * You know who is on trial here? The Defendant, he's on trial here. These officers came in and did the best job they could. They told you what they did."

{¶ 94} However, the trial counsel did not object to this argument and waived any objection except plain error. *Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph one of the syllabus.

{¶ 95} "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646. However, the evidence does not establish that the prosecutor vouched for Detective Salyer. Rather, the prosecutor was simply rebutting the trial counsel's closing argument that attacked the truthfulness of Detective Salyer's testimony. See *Goodwin,* 84 Ohio St.3d at 339–340, 703 N.E.2d 1251 (prosecutor entitled to respond to defense comments about a pretrial agreement by mentioning that the witness agreed to tell the truth as part of the plea agreement). Moreover, in making this argument, the prosecutor properly asked the jury to decide for themselves the

likelihood that Detective Salyer perjured himself. Thus, we find no prosecutorial vouching.

{¶ 96} *Commenting on Gapen's failure to testify.* Gapen also alleges that the prosecutor, during argument, committed misconduct by commenting on Gapen's failure to testify. Here, the prosecutor, Mr. Daidone, argued:

{¶ 97} "Mr. Daidone: * * * There were three people in that room at that time, three people. The Defendant killed two of them. That leaves him. That leaves him. You know what, he's a witness. He's the best witness for what he did.

{¶ 98} "Mr. Greer: I'm going to have to object to this.

{¶ 99} "The Court: Sustained. Don't go there.

{¶ 100} "Mr. Daidone: What does he say? What does he say?

{¶ 101} "Mr. Greer: Objection

{¶ 102} "The Court: Sustained."

{¶ 103} It is improper for a prosecutor to comment on a defendant's failure to testify. *Griffin v. California* (1965), 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106. In determining whether there was a violation of the defendant's Fifth Amendment rights, the court must consider " 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " (Emphasis deleted.) *State v. Webb* (1994), 70 Ohio St.3d 325, 328, 638 N.E.2d 1023, quoting *Knowles v. United States* (C.A.10, 1955), 224 F.2d 168.

{¶ 104} The prosecutor was discussing the rape offense when he commented that Gapen was the "best witness for what he did." However, the prosecutor's comments referred to Gapen's confession to the police and not his failure to testify. Indeed, after the trial court sustained the defense objection, the prosecutor mentioned Gapen's police statement:

{¶ 105} "Mr. Daidone: In the statement to Detective Salyer, what does he say about the sexual thing that occurred? He says, 'I had sex with Martha.' "

{¶ 106} When the prosecutor's comments are placed in the context of his overall argument, it is clear that his comments were not "manifestly intended * * * to be a comment on the failure of [Gapen] to testify." *Webb,* 70 Ohio St.3d at 328, 638 N.E.2d 1023. Moreover, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431. Thus, we find that the prosecutor's remarks were proper.

{¶ 107} Based on the foregoing, we overrule proposition XII.

### Penalty–Phase Issues

{¶ 108} *Instructions on readmitted evidence.* In proposition of law X, Gapen contends that the trial court erred by instructing the jury: "For purposes of this proceeding, only that evidence admitted in the trial phase that is relevant to the aggravating circumstances and to any of the mitigating factors is to be considered by you." However, Gapen did not object to this instruction and thus waived any objection but plain error. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 109} To the extent that the jury might have interpreted the trial court's instructions as allowing them to determine relevancy, the trial court erred. It is "the trial court's responsibility to determine the admissibility of evidence." *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866. However, much of the guilt-phase evidence was relevant to the aggravating circumstances, the nature and circumstances of the offense, and the mitigating factors. Additionally, overwhelming evidence properly admitted during the penalty phase supports the jury's findings that the aggravating circumstances outweighed the mitigating factors as to the aggravated murder of Young. See *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 208. Thus, the trial court's misstatement did not result in plain error. Thus, proposition X is overruled.

{¶ 110} *Ineffective assistance of counsel.* In proposition of law IX, Gapen raises two instances of ineffective assistance of counsel at the penalty phase of his trial. Reversal of a conviction for ineffective assistance of counsel requires that the defendant first show that counsel's performance was deficient and, second, "that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 111} *Failure to object to readmission of the evidence.* First, Gapen claims that defense counsel were ineffective by agreeing to readmit all trial evidence during the penalty phase. In particular, Gapen attacks the readmission of the autopsy photographs as both irrelevant and prejudicial. However, the defense counsel were not deficient in failing to object, because such evidence was admissible. See *DePew,* 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus.

{¶ 112} *Failure to object to instructions on readmitted evidence.* Second, Gapen challenges his counsel's failure to object when the trial court instructed

the jury that it had to determine what guilt-phase evidence was relevant during the penalty phase. As previously discussed, the trial court erred by giving that instruction. Regardless, Gapen was not prejudiced by defense counsel's failure to object to the instruction. Overwhelming evidence was properly admitted during the penalty phase that supported the jury's finding that the aggravating circumstances outweighed the mitigating factors as to Jesica's aggravated murder. See *State v. Jones* (2001), 91 Ohio St.3d 335, 355, 744 N.E.2d 1163. Based on the foregoing, proposition IX is overruled.

{¶ 113} *Jury deadlock.* In proposition of law I, Gapen argues that the trial court erred by instructing the jury to continue deliberations after the jury informed the trial court that it was deadlocked on which life sentence to impose.

{¶ 114} The jury began penalty deliberations at 11:45 a.m. on June 21, 2001, and retired for the day at 5:05 p.m. The jury resumed deliberations on June 22 at 8:35 a.m. At 9:58 a.m., the jury requested a clarification on the instructions that addressed voting on life sentences. After conferring with counsel, the trial court informed the jury, "The Court suggests that you reread all the instructions very carefully and slowly as they contain all of the law that the Court can give you in this matter." The jury then resumed deliberations.

{¶ 115} At 12:20 p.m. on June 22, the foreperson informed the court, "We, the jury, cannot unanimously agree on a specific life sentence and are unable to render a sentencing verdict." After a further meeting with counsel, the trial court and counsel met with the jury. The trial court read the note back to the jury and the following colloquy took place:

{¶ 116} "The Court: * * * Now this poses two questions to the Court. First of all, for the foreperson to answer is this as to all counts?

{¶ 117} "Ms. Flournoy: Yes.

{¶ 118} "The Court: Okay. Have you reached the point where you are no longer being productive as jurors in your discussion?

{¶ 119} "Ms. Flournoy: Correct."

{¶ 120} Before sending the jury back to deliberations, the court issued a supplemental instruction taken from 4 Ohio Jury Instructions (2004) 148, Section 503.011(33), and referred to as a *Howard* charge. See *State v. Howard* (1989), 42 Ohio St.3d 18, 537 N.E.2d 188, paragraph two of the syllabus. The trial court advised the jurors:

{¶ 121} "In a large portion of the cases, absolute certainty cannot be obtained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of other jurors, each question submitted to you should be examined with proper regard and deference to the opinion of others. It is desirable that this case be decided. It is your duty to

decide the case if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to re-examine your views and change your position if you are convinced that it is erroneous. If there is disagreement, all jurors should re-examine their positions given that a unanimous verdict has not been reached. Jurors for any of the verdicts should consider whether their doubt is reasonable considering that it is not shared by others * * * who have the same evidence and with the same desire to arrive at a verdict and under the same oath. Likewise, jurors for any of the verdicts should ask themselves whether or not they reasonably doubt the correctness of the judgment not concurred in by all other jurors.

{¶ 122} "You shall return a verdict of death if you unanimously, and that means all twelve, find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. If you do not so find, [then] you shall continue deliberations on the life sentence options and, if possible, unanimously return a verdict of life imprisonment * * *. However, you should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinion of other jurors.

{¶ 123} "If it is impossible for you to reach a decision in this case, please report the fact to the Court in writing."

{¶ 124} The defense objected to the instruction concerning the death penalty, arguing that the jurors were "past that point." The trial court overruled that objection.

{¶ 125} The jury resumed deliberations and retired for the day at 7:00 p.m. The jury began deliberation on June 23 at 8:35 a.m. and reached a verdict on sentence at 11:40 a.m. After the verdict was announced, the jurors were polled and confirmed that the death sentence was unanimous.

{¶ 126} Gapen claims that the jury's note clearly indicated that the deadlock was over possible life sentences and that the jury had already rejected the death penalty as an option. Citing *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96, Gapen argues that the trial court should have instructed the jury to deliberate only toward reaching a unanimous verdict on one of the three life sentences and erred by instructing the jury that it could still consider death as a sentencing option. Further, Gapen argues that the *Howard* charge undermined instructions that a solitary juror could prevent the imposition of the death penalty, in violation of *State v. Brooks* (1996), 75 Ohio St.3d 148, 159–160, 661 N.E.2d 1030.

{¶ 127} Whether a jury is irreconcilably deadlocked is a " 'necessarily discretionary determination' " for the trial court to make. *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 37, quoting *Arizona v. Washington* (1978), 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717, fn. 28. There is no bright-line

test to determine when a trial court should instruct the jury to limit itself to the life sentence options or take the case away from the jury. In making such a determination, the court must evaluate each case based on its own particular circumstances. See *State v. Mason* (1998), 82 Ohio St.3d 144, 167, 694 N.E.2d 932.

{¶ 128} The trial court did not abuse its discretion in finding that the jury was not irreconcilably deadlocked. Hence, the trial court properly instructed the jury using a *Howard* charge to continue deliberations on all sentencing options. In several cases, we have upheld the use of a *Howard* charge, specifically finding that such an instruction is not coercive, and is " 'intended for a jury that believes it is deadlocked, so as to challenge them to try one last time to reach a consensus.' " *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, at ¶ 38, quoting *State v. Robb* (2000), 88 Ohio St.3d 59, 81, 723 N.E.2d 1019; see, also, *State v. Mason* (1998), 82 Ohio St.3d 144, 167, 694 N.E.2d 932.

{¶ 129} Contrary to Gapen's assertions, the jury's note did not clearly indicate that the jury had rejected the death penalty as a sentencing option. In overruling the defense motion on limiting the sentence options, the trial court stated, "I could speculate that, but * * * the note is not horribly clear as to where they are in disagreement, [and] I must give them the charge reflecting all counts which are before them."

{¶ 130} Moreover, there is no evidence that the jury was coerced into returning a death sentence. After receiving the *Howard* charge, the jury was left with all the sentencing options and was free to return a life sentence on all counts. Indeed, the fact that the jury returned life sentences on all counts except one, the murder of Young, shows that the jury fully understood its options to return life sentences.

{¶ 131} Furthermore, the *Howard* charge did not undermine the role of a solitary juror in violation of *Brooks*, 75 Ohio St.3d at 160, 661 N.E.2d 1030. The supplemental instructions explicitly advised the jurors that if they were unable to unanimously agree to recommend death, they must consider life sentences. The jury was thus implicitly advised that a single juror could prevent the death penalty. See *Hartman*, 93 Ohio St.3d at 291, 754 N.E.2d 1150. Moreover, the trial court's penalty-phase instructions included the solitary-juror instruction, and the *Howard* charge did not rescind that instruction.

{¶ 132} Finally, this case can be distinguished from *Springer*. In *Springer*, after the jury informed the judge that it was stalemated, the judge gave the jury a supplemental charge similar to the *Howard* charge. The jury queried the judge several more times, again indicating that it was struggling against a stalemate. The jury then informed the court on the third day of deliberations that it was hopelessly deadlocked and could not unanimously recommend any

sentence, and it was discharged. *Springer,* 63 Ohio St.3d at 168–169, 586 N.E.2d 96. In contrast, after hearing the *Howard* charge, the jury in this case resumed deliberations on the afternoon of June 22 and made no further inquiries of the court before returning a verdict on the morning of June 23. Thus, unlike in *Springer,* the jury was not hopelessly deadlocked and unable to unanimously return any sentence. Thus, we overrule proposition I.

{¶ 133} *Merger.* In proposition of law II, Gapen claims that the trial court erred by failing to merge the multiple murder counts for each victim prior to the penalty-phase deliberations.

{¶ 134} The trial court overruled the defense request to merge the murder counts relating to each victim prior to the penalty-phase deliberations. However, before imposing sentence, the trial court separately merged the counts of murders regarding Madewell and Marshall into one count for each and imposed a single life sentence for each of those two murders. The trial court also merged the counts of murder regarding Jesica that brought life sentences with the single count bringing the death sentence before imposing the death sentence.

{¶ 135} The general rule is that a defendant may be charged with multiple counts based on the same conduct but may be convicted of only one, and the trial court effects the merger at sentencing. R.C. 2941.25(A); *State v. Palmer* (1997), 80 Ohio St.3d 543, 572, 687 N.E.2d 685; *State v. Waddy* (1992), 63 Ohio St.3d 424, 447, 588 N.E.2d 819. A "conviction" includes both the guilt determination and the penalty imposition. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 5, 520 N.E.2d 568. Gapen's right to not be convicted of more than one offense based upon the same conduct was not violated, because, in imposing sentence, the trial court merged the separate counts for each victim.

{¶ 136} Moreover, the trial court did not err by merging the three counts in which life sentences were recommended with the single count recommending a death sentence. Pursuant to R.C. 2929.03(D)(3), the trial court considered the jury's recommendation of the death sentence in Count 13 and then independently weighed the evidence and found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors and imposed the sentence of death. We find that the trial court properly merged all the counts for Jesica's murder and properly imposed the death sentence for Count 13 as the jury had recommended. Thus, we reject proposition II.

{¶ 137} *Inconsistent sentences.* In proposition of law III, Gapen contends that his death sentence for Jesica's murder should be vacated because the jury's sentencing verdicts—life on Counts 14 through 16 and death on Count 13—were inconsistent. Gapen argues that because the aggravating circumstances and mitigating factors were identical on each count, the inconsistent sentencing

verdicts were arbitrary and constitutionally invalid. However, we reject this argument.

{¶ 138} First, "[i]nconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict * * *." *State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030, citing *United States v. Powell* (1984), 469 U.S. 57, 68, 105 S.Ct. 471, 83 L.Ed.2d 461; see, also, *State v. Mapes* (1985), 19 Ohio St.3d 108, 112–113, 19 OBR 318, 484 N.E.2d 140. As we stated in *State v. Adams* (1978), 53 Ohio St.2d 223, 7 O.O.3d 393, 374 N.E.2d 137, paragraph two of the syllabus, "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." Thus, inconsistency of sentencing verdicts on the different counts does not require that Gapen's death sentence be vacated.

{¶ 139} Second, the jury's verdicts are not inconsistent. The jury was required to "consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense." R.C. 2929.04(B); See *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 355, 662 N.E.2d 311. Prior calculation and design were elements of the offense charged in Count 13 and an integral part of the nature and circumstances of that offense. Prior calculation and design were not elements of the felony-murders in Counts 14 through 16. In weighing the nature and circumstances of the offense, the jury may have determined that the felony-murder counts were mitigated by Gapen's despair over the failure of his marriage and in seeing Madewell with another man. On the other hand, the jury may have found that Gapen's decision to murder Jesica was not mitigated at all. See *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

{¶ 140} Based on the foregoing, proposition III is overruled.

{¶ 141} *Sentencing opinion.* In proposition of law XI, Gapen contends that the trial court's sentencing opinion improperly failed to mention his probable good adjustment to prison life as a mitigating factor.

{¶ 142} As a defense witness during the penalty phase, Dr. Robert Smith, a clinical psychologist, testified that Gapen should adapt well to prison life and act appropriately. In its R.C. 2929.03(F) sentencing opinion, the trial court did not mention Gapen's ability to adapt to prison life as a mitigating factor.

{¶ 143} We have previously recognized that the ability to adjust to prison life is a mitigating factor that can be assigned weight. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 397, 721 N.E.2d 52; *State v. Smith* (1997), 80 Ohio St.3d 89, 121–122, 684 N.E.2d 668. However, Gapen erroneously assumes that evidence that is not specifically mentioned in the sentencing opinion was not considered. "While a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips* (1995), 74 Ohio St.3d 72, 102, 656 N.E.2d 643, citing *Parker v. Dugger* (1991), 498 U.S. 308, 314–315, 111 S.Ct. 731,

112 L.Ed.2d 812. Moreover, whether to give any weight to a mitigating factor is for the trial court's determination. *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293. Finally, we will consider this factor in our independent reassessment of the sentence, which will correct any error or omission. *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124; *Maurer*, 15 Ohio St.3d at 247, 15 OBR 379, 473 N.E.2d 768. Thus, proposition XI is overruled.

{¶ 144} *Weighing and determination of the death penalty.* In proposition of law VI, Gapen argues that the death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors. Gapen claims that the murders represented a total aberration in an otherwise exemplary life and that he will adjust well to prison life. We will consider this argument during our independent sentence evaluation.

### Settled Issues

{¶ 145} *Reasonable doubt.* In proposition of law XIII, Gapen challenges the constitutionality of the trial court's instructions on reasonable doubt in R.C. 2901.05(D) during both phases of the trial. However, we have repeatedly affirmed the constitutionality of R.C. 2901.05. See *State v. Jones*, 91 Ohio St.3d at 347, 744 N.E.2d 1163. Proposition XIII is overruled.

{¶ 146} *Constitutionality.* In proposition of law XIV, Gapen attacks the constitutionality of Ohio's death-penalty statutes. We also reject this claim. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 147} Gapen also argues that Ohio's death-penalty statutes violate international agreements to which the United States is a party. However, we have rejected similar arguments. *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *Phillips*, 74 Ohio St.3d at 103–104, 656 N.E.2d 643.

### INDEPENDENT SENTENCE EVALUATION

{¶ 148} *Aggravating circumstances.* The evidence established that Gapen murdered Jesica as part of a course of conduct involving the purposeful killing of two or more persons, R.C. 2929.04(A)(5), and while committing or attempting to commit burglary, rape, and robbery, R.C. 2929.04(A)(7). However, because we have dismissed the R.C. 2929.04(A)(4) specifications, we will not consider them in weighing the aggravating circumstances against the mitigating factors.

{¶ 149} *Mitigation evidence.* Gapen called 12 mitigation witnesses and made an unsworn statement.

{¶ 150} Dr. Robert Smith interviewed and tested Gapen. Results from the Minnesota Multi–Phasic Personality Inventory ("MMPI") showed no indication of

either a severe psychotic disorder or a significant antisocial personality disorder. The MMPI indicated that Gapen tends to be "somewhat restrictive in his emotions, meaning he doesn't display a lot of emotions." The MMPI also showed that Gapen has personality traits that are "perfectionistic and obsessive."

{¶ 151} Results from the Michigan Alcoholism Screening Test ("MAST") showed that Gapen's "use of alcohol is a problem and should be explored further." The Substance Abuse Subtle Screening Inventory ("SASSI") showed that Gapen "doesn't believe he's got a problem with alcohol, but all the indicators [say] that he is [an] alcoholic."

{¶ 152} The Falstein Mini Mental Status exam ("FMMS") showed that Gapen has "no cognitive impairment * * * so there was nothing at all impaired in his thinking." Additionally, screening results from Part I of the Post–Traumatic Stress Disorder exam ("PTSD") demonstrated that "there's been no significant trauma in Mr. Gapen's life that affects him today."

{¶ 153} Dr. Smith's assessment of Gapen during their interviews was consistent with Gapen's test results. Dr. Smith found that Gapen was not mentally retarded, did not have a psychotic disorder, and showed no evidence of an antisocial or sociopathic personality. However, Dr. Smith testified that prior to the murders, Gapen had been "struggling with acute depression * * * and a number of bad things had happened in his life that were very stressful * * * and he wasn't coping very well. He was very, very sad." According to Dr. Smith, "[o]ne of the ways [Gapen] was coping * * * was increasing his use of alcohol * * * and during this period of time his use of alcohol continued and seemed to get even worse * * *."

{¶ 154} Dr. Smith also discussed behavioral problems associated with Gapen's personality characteristics. Dr. Smith stated, "The difficulty that I see for Mr. Gapen is * * * not anything outside the realm of the average person." However, Gapen has a "perfectionistic approach to life" and "obsesses." Such people tend to "agitate themselves and kind of get themselves worked up, and if they're in a very stressful time with a lot of things going wrong, that just builds on them." Additionally, "[i]f you add alcohol to that, it only gets worse," creating "the likelihood of someone acting impulsively, irrationally, and violently." As a final matter, Dr. Smith opined that Gapen would adapt well to the structured environment of prison life.

{¶ 155} William Ames, a friend of Gapen, coached football with Gapen and was a board member with Gapen for the Huber Heights Youth Football Club ("HHYFC"). For eight to ten years, Gapen worked in numerous capacities with the youth football program. Ames described Gapen as "very compassionate toward kids," saying, "If one of the kids didn't have a pair of cleats or something, he'd find a way to get a pair of cleats to the kid, and I don't ever remember him

yelling at them in anger." Ames also said, "[W]hen I first met [Gapen], I thought he was probably one of the most non-violent people I have ever met. He was not one to argue * * * just cool, calm, and collected and enjoyed having fun."

{¶ 156} Jennifer Gray, another friend of Gapen, had also met him though HHYFC and knew him for 10 years. Gapen was described as "very, very nice," and "really wonderful to the children." Gapen was also very friendly with adults and is "one person everybody really likes." Gray was also a friend of Madewell. She testified that Gapen and Madewell "got along very well * * * until his drinking started." However, once the drinking started, Gapen and Madewell would start to argue. Madewell would also drink, and she "just got nasty." Nonetheless, "[t]hey could be fighting one minute and loving the next." Finally, Gapen provided Christmas presents every year to children from needy families, and on one occasion, he organized a group that put a new roof on the home of a needy woman.

{¶ 157} Steven Menard, a policeman and long-time friend of Gapen, coached baseball and football with him. Menard stated that "Martha was a sweet lady" and that Gapen and Madewell appeared to have a "pretty good relationship" at first. After Gapen abducted Madewell in June 2000, he contacted Menard, and Menard arranged for Gapen to turn himself in to the police. Thereafter, Menard told Gapen "about a million times to stay away from her and leave her alone." Menard tried to keep Gapen focused on taking care of Jimmy and Charity and keeping himself out of trouble.

{¶ 158} From June through September 2000, Menard saw Madewell and Gapen together at football games. According to Menard, they "appeared to be a happy family, which * * * seemed a little odd to me since I knew that things weren't going well, that they were getting a dissolution." During cross-examination, Menard indicated that Gapen had a good relationship with his kids, but his relationship with Jesica was "a little bit of a challenge."

{¶ 159} James Scott, another friend of Gapen, also knew Gapen as a coach and board member of the HHYFC. Gapen was described as a very good coach, about whom HHYFC "never had any complaints * * * in all the years that Larry coached the organization."

{¶ 160} Jimmy Gapen, the defendant's son, testified that his mother had died when he was in the seventh grade. According to Jimmy, Gapen "played a really good father role for [him] and [his] sister and taught [him] * * * tons of things."

{¶ 161} In August 1993, Madewell and her four children moved into the home of Gapen and his two children. In 1996, the families moved into a large two-story house in Huber Heights. During the summer of 1999, Daniel Marshall started "running with the wrong crowd" and getting into trouble. On three occasions, Daniel and Gapen had an argument that erupted into a physical altercation

between Gapen, Madewell, and Daniel. Afterwards, Daniel was sent to live with his grandfather. According to Jimmy, Madewell was "really upset," and there was very little affection between Madewell and Gapen after Daniel left home.

{¶ 162} In the fall of 1999, Gapen and Jimmy moved out of the family home. However, Gapen and Madewell continued to see each other. During the summer of 2000, Gapen appeared to be "really upset," and his drinking became "heavier and heavier."

{¶ 163} Charity Gapen, the defendant's daughter, stated that Gapen was very happy during the early part of his relationship with Madewell. In June 2000, Charity stated that Gapen's relationship with Madewell started to change and became "hot and cold." Gapen did not have a good relationship with Daniel because Daniel "didn't like being told by anybody what to do." However, Gapen maintained a "really good relationship" with Billy. During cross-examination, Charity stated that Gapen and Jesica did not have a good relationship and "completely avoided each other."

{¶ 164} Diane Ogg, Gapen's older sister, grew up with Gapen, two other brothers, and a sister. The family lived in Pennsylvania, moved to Arizona, and then settled in Trotwood when Gapen was in the third grade. Gapen had a large paper route and loved to play baseball while growing up. He graduated from Trotwood Madison High School. Gapen was a "very likable person" and seemed to "get along well with every one" in school. Shortly after graduating from high school, Gapen was married, and his daughter, Holly, was born in 1966. Subsequently, Gapen and his first wife divorced, but Gapen retained custody of Holly. Gapen remarried, and Jimmy and Charity were born during this marriage.

{¶ 165} Bradley Ogg, Gapen's brother-in-law, went to high school with Gapen. Gapen was described as a "very outgoing, gregarious type of individual." Gapen was an "organizer," and he was "always trying to make sure things went smoothly." In 1996 or 1997, Bradley saw Gapen and Madewell at a family reunion, and "[e]verything seemed to be going very well," and "everybody seemed very happy."

{¶ 166} Barry Gapen, the defendant's younger brother, stated that Gapen was a "father figure" for Barry after their father died. Gapen taught him how to play baseball, and later in life, Gapen helped Barry get a job.

{¶ 167} Jo Ann Fister, Gapen's younger sister, saw Gapen and Madewell during the holidays and attended a family celebration at Gapen and Madewell's home. According to Fister, Gapen, Madewell, and their children appeared to get along "fine."

{¶ 168} Elaine Gilmore, Gapen's mother, testified that her family moved to the Dayton area in 1957. Gapen's father was a carpenter, who later worked for the

Blossom Hill Dairy. Later, Elaine and her husband managed three stores for Lawson's Milk Company. In 1973, Gapen's father died.

{¶ 169} According to Elaine, Gapen was "very active" while growing up and never experienced any problems at school. While in high school, Gapen worked at an IGA grocery store and delivered newspapers. As an adult, Gapen worked for Gerber Baby Foods, Pepsi for 20 years, and then Federal Express. Gapen was described as a nonconfrontational person who did not get into trouble.

{¶ 170} Elaine testified that "[e]verything seemed to be fine" during the early part of Gapen and Madewell's relationship. However, problems with the children developed when Madewell's son, Daniel, started associating with individuals involved with "drinking and dope." After Gapen and Madewell separated, Gapen told his mother that he still loved Madewell. Gapen had a close relationship with Jimmy and Charity and developed a bond with Billy Madewell. Finally, Elaine testified that Gapen was hard-working, good-natured, and good-humored, and his personality had not changed over time.

{¶ 171} *Gapen's unsworn statement.* Gapen stated that Madewell was on his mind when he got up on September 17. Gapen did not want his marriage to end. He said, "It's pretty hard to love somebody and find out that you're not going to be in her life; that they've shut you out now." When he picked up the dissolution paperwork before September 17, he did not even want to look at it, leaving it on the seat of his car.

{¶ 172} Gapen addressed the families of the victims who were in court and said, "I'm sorry that everyone has to see me under these circumstances. * * * It's tough on these families. And I'm very, very sorry, very sorry." Gapen said, "I just gave all I could give. I don't understand why * * * this had to happen. There's no reason." He also stated that he loved Billy Madewell "just like [he] loved his mom." In discussing his problems with Daniel, Gapen said, "[W]hen a young man comes home at night and he looks me straight in the eyes and he rips his tee shirt off and tells his stepdad that as long as he lives in my house, he rules * * * you just can't put up with that kind of stuff."

{¶ 173} In his concluding remarks, Gapen said, "I loved this lady so much, and now it's gotten me in such a mess, but I still care and I love her. I wish now I would have walked away. But this hurt's behind me. * * * [M]aybe she would have come back to me, who knows? I really don't know."

### Sentence Evaluation

{¶ 174} We find nothing in the nature and circumstances of these offenses to be mitigating. Gapen brutally murdered Jesica Young, an innocent 13–year–old girl, while she was asleep in her bedroom. Jesica's murder was part of a course of conduct during which Gapen murdered two other people in the house. Moreover,

Jesica's murder occurred after Gapen committed burglary, robbery, and attempted rape.

{¶ 175} However, Gapen argues that these offenses were crimes of passion. Gapen contends that he was obsessed with Madewell, distraught that their marriage had ended, and went into a rage when he found Madewell with another man. However, Gapen's explanation provides no mitigating reason for murdering Jesica. Moreover, Jesica's murder was committed with prior calculation and design. Gapen murdered an innocent child while she lay sleeping in her bed. His only explanation for killing Jesica was that she would "never give him any respect" and that she "was going to turn out just like them." Thus, we reject Gapen's claim that Jesica's murder is mitigated because it was a crime of passion.

{¶ 176} Gapen's history and background provide some mitigating features. Gapen has a long work history and served as football coach for a youth football club for many years.

{¶ 177} The statutory mitigating factors are generally inapplicable, including R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), or (B)(6) (accomplice only).

{¶ 178} The R.C. 2929.04(B)(5) mitigating factor (lack of a significant criminal record) is entitled to weight in mitigation. The record discloses no history of criminal convictions. However, at the time of trial, Gapen was under indictment for abduction and had been found guilty of a misdemeanor charge for domestic violence that was still under appeal. Under these circumstances, we choose not to accord significant weight to this factor.

{¶ 179} We give modest weight to mitigating factors under R.C. 2929.04(B)(7) (other relevant factors). First, evidence that Gapen was an alcoholic, suffered from ongoing depression, and had other psychological problems (e.g., obsessive and perfectionistic personality traits) at the time of the murders is mitigating. *Bey*, 85 Ohio St.3d at 509, 709 N.E.2d 484. However, we accord little weight to the defendant's alcoholism as a mitigating factor. See *Slagle*, 65 Ohio St.3d at 614, 605 N.E.2d 916. Second, we give weight to evidence that Gapen will adapt well to prison life. *Madrigal*, 87 Ohio St.3d at 397, 721 N.E.2d 52.

{¶ 180} Finally, Gapen's apologies to the victims' families are entitled to weight in mitigation. However, Gapen never specifically apologized for murdering Jesica. See *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 143; see, also, *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246 (remorse entitled to little weight in mitigation). We find no evidence of any other mitigating factors under R.C. 2929.04(B)(7).

{¶ 181} We find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Gapen's murder of Jesica during the course of a burglary, robbery, and attempted rape, and his course of conduct in multiple killings are grave aggravating circumstances. In contrast, Gapen offered no substantial mitigation to weigh against these collective aggravating circumstances. Thus, we find that the death penalty is appropriate.

{¶ 182} Finally, we find that the death penalty is proportionate to death sentences approved in prior cases for other course-of-conduct murders. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 130; *Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 145; and *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 162. Furthermore, the death penalty is proportionate to death sentences approved for other burglary-murder and robbery-murder cases. See *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 118; *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 124; *State v. Stallings* (2000), 89 Ohio St.3d 280, 301, 731 N.E.2d 159. Finally, the death penalty is proportionate to death sentences approved for other attempted-rape/attempted-murder cases. See *State v. Bies* (1996), 74 Ohio St.3d 320, 328, 658 N.E.2d 754; *State v. Scudder* (1994), 71 Ohio St.3d 263, 276, 643 N.E.2d 524; *State v. Powell* (1990), 49 Ohio St.3d 255, 264, 552 N.E.2d 191.

### Conclusion

{¶ 183} We dismiss Count One and the R.C. 2929.04(A)(4) specifications in Counts 5 though 16. However, we affirm the remaining convictions and sentence of death.

Judgment affirmed in part<br>and reversed in part.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, O'CONNOR and O'DONNELL, JJ., concur.

### APPENDIX

{¶ 184} First Proposition of Law: Once a capital jury in the penalty phase has indicated that it has rejected the death sentence and is deadlocked as to which life sentence to impose, it is constitutionally impermissible for the trial court to instruct it to return to its deliberations and to consider death in an effort to reach a unanimous verdict.

{¶ 185} Second Proposition of Law: When the trial court fails to merge multiple aggravated murder counts for a single victim prior to the sentencing phase and a jury returns divergent sentencing recommendations for those counts, the resultant death sentence is invalid and violates the Eighth and Fourteenth

Amendments to the United States Constitution and Article I, Sections 2, 9 and 16 of the Ohio Constitution.

{¶ 186} Third Proposition of Law: Where the jury recommends the death sentence for one count of aggravated murder, but recommends a life sentence on three other counts for the same victim, and the aggravated circumstances and mitigating factors are identical, the resulting death sentence is arbitrary and must be vacated. U.S. Const. Amends. VIII.

{¶ 187} Fourth Proposition of Law: Where there is insufficient evidence of an escape, a trial court's denial of a Rule 29 motion for acquittal violates a capital defendant's rights guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 188} Fifth Proposition of Law: Where the trial court fails to give any instruction as to an essential element in a capital specification, a jury's finding of guilty of that specification must be vacated. U.S. Const. Amends. VI, VIII and XIV.

{¶ 189} Sixth Proposition of Law: Where the defendant has led an otherwise exemplary life with the murder being a total aberration and he will adjust well to prison, the death penalty is not the appropriate punishment.

{¶ 190} Seventh Proposition of Law: Police may not interrogate a defendant who has just invoked his *Miranda* rights to silence and to counsel. A defendant does not "initiate" further questioning about the crime, and thereby waive his right to counsel, by asking an innocuous question about the welfare of his step-children. Admission of statements taken in violation of the *Miranda* rights to silence and to counsel violate the defendant's rights guaranteed by the Fifth and Fourteenth Amendments.

{¶ 191} Eighth Proposition of Law: The introduction of gruesome photographs with no probative value but which are highly prejudicial violates a capital defendant's right to a fair trial, due process, and a reliable determination of guilt as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 192} Ninth Proposition of Law: Trial counsel's performance is deficient when they permit the readmission of all trial phase evidence into penalty phase and allow the trial court to instruct the jury to decide what evidence is admissible regarding the aggravating circumstances to appellant's prejudice. U.S. Const. Amends. VI, VIII, XIV; Ohio Const. Art. I, Section 10.

{¶ 193} Tenth Proposition of Law: A capital defendant's right to a fair and reliable trial is violated when the trial court instructs the jury to determine which

trial phase evidence is relevant to the aggravating circumstances in the penalty phase. U.S. Const. Amend. VIII and XIV; Ohio Const. Art. I, Sections 9 and 16.

{¶ 194} Eleventh Proposition of Law: The trial judge's failure to consider the mitigating factor of appellant's probable good adjustment to prison life violated the Eighth and Fourteenth Amendment requirement that the sentencer must give consideration to all relevant mitigating evidence in a capital case.

{¶ 195} Twelfth Proposition of Law: A capital defendant is denied his substantive and procedural due process rights to a fair trial when a prosecutor commits acts of misconduct during the trial phase of his capital trial. He is also denied his right to reliable sentencing. U.S. Const. Amends. VIII, XIV; Ohio Const. Art. I, Sections 9 and 16.

{¶ 196} Thirteenth Proposition of Law: A capital defendant's right to due process is violated when the state is permitted to convict upon a standard of proof below proof beyond a reasonable doubt. U.S. Const. Amend. XIV; Ohio Const. Art. I, Section 16.

{¶ 197} Fourteenth Proposition of Law: Ohio's death penalty law is unconstitutional. R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 do not meet the prescribed constitutional requirements and are unconstitutional on their face as applied to Larry Gapen. U.S. Const. Amends. V, VI, VIII, XIV; Ohio Const. Art. I, Sections 2, 9, 10, 16. Further, Ohio's death penalty statute violates the United States' obligations under international law.

––––––––––

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, Kirsten Brandt and R. Lynn Nothstine, Assistant Prosecuting Attorneys, for appellee.

David H. Bodiker, State Public Defender, Stephen A. Ferrell, Jane P. Perry, and Robert K. Lowe, Assistant Public Defenders, for appellant.