[Cite as *State v. Bullucks*, 2018-Ohio-2159.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170220 |
| | | TRIAL NO. B-1602625 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| COLLIENS BULLUCKS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Common Pleas Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 6, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*J. Rhett Baker,* for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1}  Defendant-appellant Colliens Bullucks appeals his convictions, following a jury trial, for the forceful vaginal rape of 15-year-old L.D., in violation of R.C. 2907.02(A)(2), and the felonious assault of her stepmother, in violation of R.C. 2903.11(A)(1).  The jury acquitted Bullucks of a second count of forceful anal rape of L.D., in violation of R.C. 2907.02(A)(2), and a second count of felonious assault of her stepmother, in violation of R.C. 2903.11(A)(2).   The trial court sentenced Bullucks to 11 years in prison for the rape offense and eight years in prison for the felonious-assault offense, and it ordered that the terms be served consecutively, for an aggregate sentence of 19 years in prison.

{¶2}  In this appeal, Bullucks challenges the effectiveness of his trial counsel, the trial court's handling of two deadlocks by the jury during deliberations, and the weight of the evidence adduced to support his convictions.  None of his assigned errors are meritorious.  We, therefore, affirm his convictions.

### *Evidence at the Jury Trial*

{¶3}  At trial, 15-year-old L.D. testified that she had first met 42-year-old Bullucks on the streets when she had run away from home.  She had kept in contact with him through social media, because she wanted to move out of her home and wanted an older man to take care of her.  Bullucks sent L.D. text messages stating that he was interested in having sex with her.  L.D. enjoyed smoking marijuana, and Bullucks had offered to give her marijuana in exchange for sex.  L.D. arranged to meet Bullucks in the basement of her home on the morning of May 12, 2016.  Bullucks entered through the basement door.  He gave L.D. marijuana, which she took upstairs to her bedroom.  L.D. returned to the basement and performed oral sex on Bullucks.  When she stopped, Bullucks became angry.  L.D. went upstairs.  She sent Bullucks a text message asking

him to leave. Bullucks texted L.D. to come downstairs and lock the basement door. When L.D. returned to the basement, Bullucks was standing next to a pool table with his pants down.

{¶4} Bullucks grabbed L.D., placed her in a chokehold, and bent her over the pool table. As L.D. struggled against him, Bullucks pulled her pants down and put his penis into her anus and vagina. L.D. stated that it hurt, and she felt his penis in both places. As Bullucks penetrated her, he continued to choke her. L.D. couldn't breathe and she couldn't get away from him. Eventually she passed out.

{¶5} L.D.'s stepmother, who had been upstairs with her three-year-old nephew during this time, decided to wash some laundry in the basement. As she descended the stairs in her nightgown with a laundry basket and her young nephew behind her, she saw L.D. lying facedown on the floor with her pants down. She called out to L.D., but L.D. did not respond.

{¶6} She heard movement behind the pool table and saw Bullucks walk around the pool table, step over L.D., and come toward her. She started yelling at Bullucks, asking him who he was and why he was in her home. As Bullucks kept coming toward her, she told her three-year-old nephew to run up the stairs. She followed him up the stairs and tried to shut the basement door, but Bullucks caught her at the top of the stairs. He placed his arm around her neck and beat her around the head, face, and body with his fists. As they tussled upstairs, she eventually broke free and ran to the kitchen. She tried to leave through the kitchen door.

{¶7} When she could not, she grabbed some knives on the counter and tried to defend herself. She stabbed at Bullucks. Bullucks yelled at her to drop the knives, telling her that he had a gun and was going to kill her. As they struggled, she was stabbed in the back two times. Bullucks also bit her twice on the back of her neck and once on the

3

shoulder. L.D.'s stepmother broke free and ran to the front door, but Bullucks grabbed her by the hair and pulled her backward. He picked up a figurine on a nearby coffee table and started beating her with it. L.D.'s stepmother was eventually able to break free from Bullucks. She used her shoulder to break through the front door. She grabbed her three-year-old nephew and ran out the door, screaming for help. She ran to her neighbor's house. Her neighbor met her on the porch and called for emergency assistance.

{¶8} In the meantime, L.D. had regained consciousness and walked upstairs. L.D. said she did not want to get in trouble, so she picked up a rag and tried to clean the blood from the walls. She started calling for her stepmother. Bullucks appeared instead. He slapped her in the face and then left the home through the basement door.

{¶9} Meanwhile, L.D. heard her stepmother calling for her. She walked barefoot to her stepmother at the neighbor's home. L.D.'s stepmother testified that L.D.'s hair was messy, her pants were soaked with urine, and she appeared shaken. The responding police officers searched L.D.'s home and ultimately apprehended Bullucks in the backyard of another neighbor's home. They found marijuana, a phone, $103, and a condom on his person.

{¶10} Bullucks was taken to the hospital, where he was treated for a bite mark and knife wounds. He was interviewed by the police shortly thereafter. The police officer who interviewed Bullucks testified at trial, and a DVD of her interview with Bullucks was played to the jury. Bullucks told the investigating officer that he had come to the home to sell marijuana to a man named Red. He entered the residence through a basement door. Red and L.D. were inside. He thought the details of the drug sale had been worked out, but Red waffled at the terms. Bullucks saw a bulge in Red's pants and figured it was a gun. The next thing he knew, Red had hit him in the head, and he

4

blacked out. When he regained consciousness, he had been robbed of his money and marijuana. He then saw a woman coming down the basement steps. When she screamed at him, he panicked. He followed her up the stairs and tussled with her as he tried to leave the home. He said that the woman had grabbed some knives during their fight, and that they had both sustained injuries.

{¶11} Bullucks denied knowing L.D. or having any sexual contact with her. The investigating officer told Bullucks that he could avoid a rape charge if he submitted to a penile swab and it came back without her DNA, but he refused to consent to the swab. When the investigating officer left the interview room, Bullucks spit on his hand and he placed it down his pants. He then took a tissue from a box on the table where he was seated. He wiped his penis and tossed the tissue in the wastebasket next to the table.

{¶12} L.D. and her stepmother were taken to the hospital. A sexual-assault nurse interviewed L.D. and conducted a rape examination. The sexual-assault nurse testified that L.D. had told her that she had been strangled and raped vaginally and anally. L.D. had blood and bruises on her lower lips and gums, bruised eyes and cheeks, and bruising on her left ear. The nurse stated that the bruising behind L.D.'s left ear was "pretty common" in patients who claimed to have been strangled. L.D. also had a tear and an abrasion to her cervix. The nurse said the tear was from "some type of penetrating trauma." The nurse took photographs of L.D., documented her injuries, and swabbed her anus and vagina for DNA testing.

{¶13} L.D.'s stepmother testified that she had had two stab wounds to her back that required stitches, two bite marks to her neck, another bite mark to her shoulder, bruising to her arms and legs, and injuries to her mouth. L.D.'s stepmother said that at the time of trial, her mouth was still "wired up" from where Bullucks had hit her in the mouth. Her medical and dental records were admitted into evidence.

{¶14} A serologist testified that no semen had been found on the vaginal and anal swabs taken from L.D. L.D.'s DNA was present on the penile swabs taken from Bullucks. The serologist further testified that DNA from Bullucks and L.D.'s stepmother had been found in blood on the knives that had been taken from L.D.'s residence. The serologist's report was admitted into evidence.

{¶15} At trial, L.D. admitted that when she had first been interviewed by the sexual-assault nurse and the police, she lied and told them that a stranger had broken into her home, forced her to have vaginal and anal sex in the basement, and choked her until she had passed out and that when she had come to, she had gone upstairs and again encountered the man, who slapped her in the face and fled.

{¶16} During a second interview with police, however, L.D. admitted that she had let Bullucks into the house, and that she had consented to perform oral sex. She said she had not admitted this at first because she was ashamed of her conduct and was worried that her parents would be angry with her.

{¶17} Bullucks testified at trial that he had lied to police in his interview when he said that he did not know L.D. He said that he had had oral sex with L.D., and that he had been concerned that telling the truth would make him "look bad." He stated that he had first met L.D. through social media, which led to a meeting in person four weeks before this incident. He then met L.D. a couple weeks later at L.D.'s residence. He admitted that on May 12, 2016, L.D. had been angry with him for arriving late and had said there was only enough time for her to give him oral sex. He said that she had told him not to come in her mouth. He did, however, and she went upstairs to brush her teeth. Bullucks gave L.D. some marijuana, but she was angry that it was not enough. So he offered her a cigarillo filled with marijuana, but she did not want it.

{¶18} He gave L.D. $10 to buy snacks and her own "rillos." She then went upstairs and texted him, stating that "this bullshit will not happen again," and that he should find someone else. Bullucks said he called her and argued loudly with her on the phone. The basement door then opened, and a woman saw him. She exclaimed, "Who are you and how did you get in here?" The woman ran upstairs, and he followed her. She came at him with a knife, and they tussled as he tried to get out of the house. Both were injured by the knives during the fight. He also bit her, but he could not remember how many times. He admitted that he had tried to jump a fence and run from the scene before being apprehended.

### *Ineffective Assistance for Failure to Raise Speedy-Trial Claim*

{¶19} In his first assignment of error, Bullucks argues that he was denied the effective assistance of trial counsel, where his trial counsel failed to file a motion to dismiss the charges against him based upon a violation of his speedy-trial rights.

{¶20} To prevail on his claim, Bullucks must show that his trial counsel's representation fell below an objective standard of reasonableness, and that he was prejudiced by counsel's deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is demonstrated by showing "that there is a reasonable probability that, but for * * * [the] errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Both elements must be present to demonstrate ineffective assistance of counsel. *Id.* at 697.

{¶21} Here, Bullucks was charged with two counts of rape, both first-degree felonies, and two counts of felonious assault, both second-degree felonies. Thus, the state had 270 days to bring Bullucks to trial. *See* R.C. 2945.71(C)(2). The record

reflects that Bullucks was held in jail without bail. Thus, he was entitled under R.C. 2945.71(E), the triple-count provision, to be tried within 90 days of his arrest, unless the reasons enumerated in R.C. 2945.72 extended the time for trial. *See State v. Ramey*, 132 Ohio St.3d 309, 2012-Ohio-2904, 971 N.E.2d 937, ¶ 15. As of January 17, 2017, the state had 65 days to bring Bullucks to trial. Bullucks contends that he was tried outside the 90-day limit because of three unexplained continuances in the court's entries journalized January 17, 2017, March 1, 2017, and April 10, 2017. *See State v. Mincy*, 2 Ohio St.3d 6, 441 N.E.2d 571 (1982), syllabus.

{¶22} Each of the court's continuance entries had an asterisk beside the signature line for defense counsel. Directly below the signature line and beside the asterisk were the words: "Defense counsel waives all speedy trial rights in accord with R.C. 2945.71 et seq." Bullucks's counsel signed the January 17, 2017 and April 10, 2017 entries, and therefore, expressly waived time during the 43 days identified in these entries. *See Ramey* at ¶ 18; *State v. McBreen*, 54 Ohio St.2d 315, 376 N.E.2d 593 (1978). But Bullucks's counsel did not sign the March 1, 2017 entry, the trial court provided no reason for the continuance in its entry, and our review of the record does not demonstrate a reason for the continuance. *Compare State v. Benton*, 1st Dist. Hamilton Nos. C-130556, C-130557 and C-130558, 2014-Ohio-2163, ¶ 11 (where the hearing transcript corresponding to the continuance entry explained the reason for the continuance). Thus, the 22 days identified on the entry from March 13, 2017, to April 4, 2017, must be counted against the state. *See Mincy* at syllabus.

{¶23} Because only 47 days were attributable to the state at the start of Bullucks's trial on April 5, 2017, his speedy-trial rights were not violated, and defense counsel was not ineffective for failing to file a motion to dismiss on that basis. *See*

*Strickland*, 466 U.S. at 686-687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989). We, therefore, overrule the first assignment of error.

### Howard Charge

{¶24} In his second assignment of error, Bullucks contends that the trial court erred both by failing to give the jury the instruction set forth in *State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989) when the jury first reported it was deadlocked, and by failing to declare a mistrial when the jury reported a second time that it was deadlocked.

{¶25} The giving of a *Howard* charge is a matter within the court's discretion. *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 127. The record reflects that on April 10, 2017, around 12:40 p.m., the jury began deliberations. Shortly after 4:00 p.m., the jury informed the trial court that it was deadlocked. After conferring with counsel by phone, the court adjourned the jury at 4:15 p.m. The jury resumed deliberations at 10:00 a.m. the following day, April 11, 2017. At that time, the court conferred with counsel, and neither party objected to the court's instruction that the jury continue its deliberations.

{¶26} The jury continued its deliberations and submitted three separate inquiries to the court regarding the evidence related to the rape counts. In each instance, the trial court, after conferring with counsel, instructed the jury to rely upon its collective memory. Around 2:45 p.m., the jury informed the court that it had deadlocked a second time. The trial court, over Bullucks's objection, gave the jury the *Howard* charge and sent them back for further deliberations. Around 3:35 p.m., the jury submitted an additional question concerning the evidence related to

9

the rape counts before rendering a unanimous verdict at 11:30 a.m. the following morning, April 12, 2017.

{¶27} Given that the jury had deliberated for less than four hours before first announcing that it was deadlocked, and in the absence of any objection by Bullucks, we cannot conclude that the trial court committed plain error by failing to give the jury the *Howard* charge at that time. Nor can we conclude the trial court abused its discretion when it gave the jury the *Howard* charge, over Bullucks's objection, following the jury's announcement that it was still deadlocked. The court's decision to instruct the jury to continue deliberations was reasonable under the circumstances. The jury was engaged in reviewing the evidence related to the rape counts, as reflected by its submission of an additional question, and it was ultimately able to reach a unanimous verdict the following day. *See State v. McCoy*, 1st Dist. Hamilton No. C-090599, 2010-Ohio-5810, ¶ 57-60; *State v. Beasley*, 1st Dist. Hamilton No. C-980535, 1999 WL 162453, *2-3 (March 26, 1999); *State v. Dickens*, 1st Dist. Hamilton No. C-960365, 1998 WL 226537, *2 (May 8, 1998). We, therefore, overrule the second assignment of error.

### Weight of the Evidence

{¶28} In his third assignment of error, Bullucks challenges the weight of the evidence adduced to support his rape and felonious-assault convictions.

{¶29} Our review of the record fails to persuade us that the jury, acting as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *See State v. Thompkins*, 78 Ohio St.3d 386, 387, 678 N.E.2d 541 (1997).

{¶30} Bullucks highlights inconsistencies in the testimony of L.D. and her stepmother in identifying him as the perpetrator, but the jury, in resolving the

conflicts in their testimony, could have properly found that Bullucks had committed the offenses. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶31} Next, Bullucks contends that the absence of semen on the swabs taken from L.D.'s vagina renders his rape conviction contrary to the weight of the evidence. But under R.C. 2907.01(A), the state was required to prove penetration, and not ejaculation, as an element of rape. Thus, despite the absence of semen on the swabs from L.D.'s vagina, the jury could reasonably have concluded from L.D.'s testimony and the testimony of the sexual-assault nurse that Bullucks had vaginally raped L.D. *See State v. McKinnon*, 7th Dist. Columbiana No. 02 CO 36, 2004-Ohio-3359, ¶ 128-132.

{¶32} Finally, the jury was entitled to reject Bullucks's theory that L.D.'s stepmother had sustained knife wounds as a result of her attack on Bullucks. The state's evidence showed that L.D.'s stepmother had two knife wounds to her back, in an area where it would have been impossible for her to self-inflict the wounds. L.D.'s stepmother additionally testified that during her struggle with Bullucks, he had repeatedly punched her in the face and mouth and hit her with a figurine, which caused her mouth to be "wired" shut for almost a year after the attack, and that she had visible scars from Bullucks's bites to her neck and shoulder. Her testimony was corroborated by photographs of her injuries and her medical and dental records. We, therefore, overrule the third assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**CUNNINGHAM, J.,** concurs.
**ZAYAS, J.,** concurs separately.

**ZAYAS, J.,** concurring separately.

{¶33} I concur, but write separately to discuss the continuance forms journalized in this proceeding. The record reflects that four continuances were granted prior to September 28, 2016. The continuance form then in use required the parties to check a box reflecting who requested the continuance and contained a separate box for the defendant to check when he or she was waiving time. The next court date was handwritten on the form, and the form was signed by the prosecutor and the defense attorney. The form limited the waiver to the next court date that was written on the form.

{¶34} The record reflects that a new form, that appears to be an electronic form, was utilized beginning with the continuance granted on September 28, 2016. This new form is electronically signed by all parties involved and the trial court. The electronic form added an asterisk after the signature line for the defendant's attorney. The asterisk indicates that the "[d]efendant waives all speedy trial rights in accord with R.C. 2945.71 et seq."

{¶35} Consequently, defense counsel's signature on the electronic form results in a waiver of the defendant's right to a speedy trial. Accordingly, the form is structured in such a manner that any continuance granted at the state's request or sua sponte by the court automatically waives the speedy-trial time if defense counsel signs the form.

{¶36} Although Bullucks conceded that trial counsel waived time by signing the electronic form, I am sufficiently troubled that I feel compelled to write separately. The new electronic form defaults to a time waiver merely by the signature of defense counsel. To preserve the defendant's speedy-trial rights, defense counsel must take some additional step, such as refuse to sign the form. The electronic form may unintentionally circumvent an accused's speedy-trial rights.

Please note:

The court has recorded its own entry this date.

