[Cite as *State v. Gapen*, 2021-Ohio-3252.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28808 |
| | : | |
| v. | : | Trial Court Case No. 2000-CR-2945 |
| | : | |
| LARRY JAMES GAPEN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of September, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ALLEN L. BOHNERT, Atty. Reg. No. 0081544 & ADAM M. RUSNAK, Atty. Reg. No. 0086893, 10 West Broad Street, Suite 1020, Columbus, Ohio 43215
    Attorneys for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} In this capital case, Defendant-Appellant Larry James Gapen appeals from the judgment of the Montgomery County Court of Common Pleas, which overruled his motion for leave to file a delayed motion for a new trial. For the reasons that follow, the trial court's judgment will be affirmed.

I.   **Facts and Procedural History**

{¶ 2} Around 7:30 p.m. on September 17, 2000, Gapen entered the home of his ex-wife, Martha Madewell, and saw her lying on the couch in the basement with an unfamiliar man. Instead of announcing his presence, he left unnoticed. After having dinner with his son and his son's girlfriend, he returned in the early morning hours of September 18 and found Madewell and the still-unknown man (he was later identified as Nathan Marshall, Madewell's ex-husband) asleep on the same basement couch.

{¶ 3} This time Gapen did not leave. Instead, he produced a chopping maul (a type of axe) and brutally beat the sleeping pair to death with the weapon. Gapen admitted to investigators that after attacking Madewell, he had sexual relations with her. Forensic evidence presented at trial confirmed the claim. Gapen then climbed two flights of stairs to the bedroom of Madewell's 13-year-old daughter, Jessica Young, where he beat her with the maul as well because, as he told detectives, she had been disrespectful to him.

{¶ 4} Gapen left the maul in the second-floor bedroom and departed the residence. One of Madewell's other children heard the commotion and found the bodies of his mother and Marshall in the basement. He then went upstairs and found Jessica bleeding and badly injured, but still alive. The police were called, and Jessica was taken to the hospital where she later died from her injuries.

{¶ 5} Approximately 7:30 the following morning, Gapen was arrested at a doughnut shop in Vandalia. Officers found Madewell's purse inside his vehicle. He later confessed to detectives that he was not sorry and, in fact, felt relieved. He stated that it "felt like a weight had been lifted from him," and that "this [was] the best * * * he had felt in weeks."

{¶ 6} On October 18, 2000, Gapen was charged in a 16-count indictment with escape, rape, aggravated burglary, aggravated robbery, and the aggravated murders of Madewell, Marshall, and Young. There were four counts of aggravated murder pertaining to each of the three victims and each count included five death specifications. The five aggravating specifications were:

(1) The offenses were committed while Gapen was under detention or at large from having broken detention;

(2) The offenses were part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons;

(3) The offenses were committed while Gapen was committing, attempting to commit, or feeling immediately after committing or attempting to commit the offense of aggravated burglary and Gapen was the principal offender in the commission of the aggravated murder;

(4) The offenses were committed while Gapen was committing, attempting to commit, or fleeing immediately after committing or attempting to commit the offense of rape and Gapen was the principal offender in the commission of the aggravated murder; and

(5) The offenses were committed while Gapen was committing, attempting to commit, or fleeing immediately after committing the offense of aggravated robbery

and Gapen was the principal offender in the commission of the aggravated murder.

Trial Court Proceedings

{¶ 7} Following a host of pretrial motions and other proceedings, the case proceeded to a jury trial on May 21, 2001. The trial lasted several weeks and resulted in the jury finding Gapen not guilty of rape, but guilty on all remaining counts and death penalty specifications.

{¶ 8} The penalty phase of the trial followed, and Gapen presented many witnesses in mitigation. Dr. Robert Smith, a clinical psychologist, testified that at the time of the offense, Gapen was in acute depression, was a functioning alcoholic, an obsessive, and a perfectionist. It was his opinion, however, that Gapen had no anti-social tendencies or any post-traumatic stress disorders. The defense also called "character witnesses," including family members, law enforcement officers with whom he had interacted over the years, and men and women associated with youth football leagues in the area, as Gapen was a long-time youth coach.

{¶ 9} After several days of deliberations, the jury returned with a recommendation of life imprisonment without parole for the murders of Madewell and Marshall. However, they found beyond a reasonable doubt that the aggravating circumstances of which Gapen was found guilty in the murder of Young outweighed the mitigating factors, and recommended that Gapen be sentenced to death for the aggravated murder of Young by prior calculation and design.

{¶ 10} Gapen's lead trial counsel believed the verdicts to be "inconsistent" because the jury recommended the death sentence for only one of the three murder convictions

and suspected this was a case of juror misconduct or the jury's violating the court's instructions. Counsel objected on the record immediately post-verdict and then filed a motion a few days later to further his argument. The motion was overruled.

{¶ 11} On July 3, 2001, the trial court accepted the jury's recommendation and sentenced Gapen to death for Young's murder and life in prison without the possibility of parole for the murders of Madewell and Marshall. In addition, the court imposed additional terms of imprisonment on the underlying offenses totaling 25 years, to be served consecutively to his aggravated murder sentences.

Direct Appeal

{¶ 12} On August 23, 2001, Gapen filed his direct appeal at the Ohio Supreme Court and raised 14 propositions of law. That Court found one proposition relating to the escape conviction (and the associated specifications) to be well-taken and dismissed that specific conviction. The Supreme Court affirmed all of Gapen's other convictions and independently weighed the aggravating circumstances against the mitigating factors and compared his death sentence to others imposed in similar cases. The death sentence arising from Young's murder was affirmed in December 2004. *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047. (*Gapen I*).

2002 Post-Conviction Petition

{¶ 13} While his direct appeal was ongoing, Gapen was appointed a team of lawyers and investigators from the Ohio Public Defender's office to litigate post-conviction matters. By the fall of 2002, Gapen's post-conviction team had begun the process of finding and interviewing jurors, and in September 2002, the team spoke with several jurors including Juror M.M., Juror R.S., and Juror D.N.

{¶ 14} Armed with the information gleaned from the juror interviews, on October 4, 2002, Gapen filed a petition for post-conviction relief pursuant to R.C. 2953.21 and a motion for discovery. The post-conviction petition alleged, among other things, that the jurors ignored the trial court's instructions and (1) improperly considered non-statutory aggravating circumstances in deciding whether to impose the death penalty, (2) improperly considered evidence other than what was admitted during trial, and (3) failed to keep an open mind during the penalty phase. It also alleged ineffective assistance of counsel for not offering a psychological explanation for Young's murder and for not presenting Gapen's testimony during the guilt phase of the trial.

{¶ 15} In support of the juror misconduct claim, Gapen attached the affidavit of Kathryn Sandford, an attorney with the Ohio Public Defender's office who attended two juror interviews. Her statement averred that Juror R.S. said that the primary aggravating circumstance that weighed in favor of the death penalty was the premeditation of the crimes. According to Sandford's affidavit, Juror R.S. also admitted that after the evidence was presented at the guilt phase, he had already made up his mind to vote for the death penalty. Further, Sandford reported that Juror R.S. claimed that another juror, D.N., conducted his own outside research on the death penalty and relayed that information during deliberations.

{¶ 16} While some information Sandford got from Juror R.S. was likely favorable to Gapen, Juror R.S. also stated that Gapen's attorneys "went to great lengths to explain Mr. Gapen's crime of passion as it related to Martha Madewell and the man she was sleeping with[.] * * * [They] never addressed any reason for the death of Mr. Gapen's thirteen-year-old step-daughter."

{¶ 17} Gapen submitted a second Sandford affidavit, this time regarding her interview with Juror M.M. In it, she averred that Juror M.M. said the most significant aggravating circumstance was the "cold-bloodedness" of Gapen's killing two people in the basement, "calmly" talking to a step-daughter who noticed the commotion, then "calmly" walking up the stairs to kill Young, and then "calmly" talking to another step-child. Juror M.M. also relayed his opinion that the defense theory of a "crime of passion" fit the killings of Madewell and Marshall, but not Young. Further, Juror M.M. stated that another juror, Juror D.N., conducted independent research into the Biblical meaning of the death penalty and shared his views with the rest of the jury. Finally, he revealed that Juror D.N. read religious texts during side bars and while waiting for trial to resume during breaks.

{¶ 18} The post-conviction motion had a third affidavit attached, from Dorian Hall, an investigator with the Ohio Public Defender's office who was present during the Juror D.N. interview. According to Hall's affidavit, Juror D.N. indicated that, in his view, if a person is guilty of murder, the only appropriate sanction is death. Further, Hall indicated that Juror D.N. stated that he made up his mind to vote for death at the conclusion of the guilt phase.

{¶ 19} According to the defense team affidavits, none of the jurors interviewed were willing to sign an affidavit.

{¶ 20} On December 16, 2002, the State filed a motion for summary judgment in the post-conviction proceeding. The trial court granted the motion in March 2004 without a hearing, and Gapen timely appealed. On appeal, we affirmed the trial court's decision as to the dismissal of the juror misconduct claims but reversed the court's denial of Gapen's ineffective assistance of counsel claim for not presenting expert testimony

explaining why Young was killed. *State v. Gapen*, 2d Dist. Montgomery No. 20454, 2005-Ohio-441 (*Gapen II*).

{¶ 21} Upon remand, the trial court held an evidentiary hearing, at which lead trial counsel and Dr. Smith testified. After issuing a lengthy written opinion, the trial court again overruled Gapen's post-conviction petition, finding that Gapen could not demonstrate either deficient performance by trial counsel or prejudice. Again, Gapen appealed, and we affirmed, reasoning, in part, that "[t]he decision of what mitigating evidence to present during the penalty phase of a capital trial is a matter of trial strategy." *State v. Gapen*, 2d Dist. Montgomery No. 21822, 2007-Ohio-4333, ¶ 22 (*Gapen III*).

Federal Habeas Corpus Proceedings

{¶ 22} In the summer of 2008, Gapen had federal counsel appointed, and on March 10, 2009, he filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio. The petition alleged 23 grounds for relief. He then filed several amended petitions. Under federal habeas procedures, Gapen's attorneys can be equipped with subpoena power with leave from the District Court, and in early October 2010, federal counsel, for the first time, made a deposition request. The discovery request was granted in late October 2011.

{¶ 23} In December 2011 and January 2012, members of Gapen's federal team began informally interviewing jurors. Juror M.M. was interviewed twice in December 2011 by Jacob Cairns and Allen Bohnert, assistant federal public defenders. According to Cairns' affidavit, during the first interview on December 1, 2011, Juror M.M. disclosed that a few years before sitting as a juror on the Gapen trial, there was an attempted murder-suicide in a duplex property that he owned. He also told the attorneys that during

deliberations, jurors found a receipt in Gapen's wallet that indicated Gapen had purchased a gun. Cairns' affidavit stated that Juror M.M. found this to be significant because "it showed that Mr. Gapen had been plotting the homicides for some time and that they were premeditated." The affidavit also noted that Juror M.M. told Cairns that after the conclusion of the trial, he and a few other jurors spoke with the trial judge. Juror M.M. stated that he asked the judge about the gun receipt and the judge purportedly responded that "it was irrelevant."

{¶ 24} On December 14, 2011, Juror M.M. was again interviewed by Cairns. This second interview, according to the Cairns' affidavit, centered around the gun receipt found in Gapen's wallet. Juror M.M. indicated that he believed Gapen had used a fake social security number to purchase the gun because, he suspected, Gapen would have been unable to use his own due to pending charges and because he was on home electronic monitoring.

{¶ 25} According to Cairns' affidavit, Juror M.M. declined to sign an affidavit, and in January 2012, he passed away.

{¶ 26} Cairns was involved in the interviews of several other jurors during this time period, including Jurors D.N., R.S., D.B., R.S.G., and H.R.

{¶ 27} Following the informal interviews, several jurors were deposed in federal court on January 26-27, 2012, and May 31, 2012. The depositions of Jurors V.T., Redacted Juror, and M.F. were all brief and they testified that they did not recall anything out of the ordinary during the trial or deliberations. Juror D.N.'s deposition, however, was lengthy and expanded on issues Gapen raises in his motion for leave to file a delayed motion for a new trial.

{¶ 28} Juror D.N. testified that when he learned he was going to be a juror in this case, he did some internet research into crime and punishment, specifically the death penalty. He was clear, though, that he did not bring any of that material with him to the courthouse. Juror D.N. also testified that he brought a book with him into sequestration entitled "Relativism, Feet Firmly Planted in Mid-Air." This was a book, he said, that he ordered prior to trial and it just happened to be delivered during that period. He further stated that the book did not influence his thinking at the trial because he did not yet understand its teaching.

{¶ 29} There was also discussion during the deposition about Juror D.N.'s adoption and understanding of the theory of "lex talionis," which he described as a philosophy which teaches that "the crimes should equal the punishment." Juror D.N. claimed, however, that the philosophy did not play a role in his deliberations. "11 years ago, I was just becoming familiar with this stuff. * * * Back then I was convinced about Gapen more on the evidence in the court. The evidence is what drove me to the decision." He did admit, though, that he mentioned "lex talionis" to the other jurors, but insisted that he just defined the term and did not try to impose his views on them.

{¶ 30} Juror D.N. also revealed that he sent an email to the judge shortly after the trial's conclusion. The email stated that to reach a verdict, the jury compromised. But as to Young, "we all unanimously voted that there were no mitigating circumstances thus the death penalty fit the crime (lex talionis)."

{¶ 31} On September 30, 2013, Gapen filed a motion to stay and abey the habeas process to pursue new state court proceedings. Gapen's federal attorneys were granted permission to litigate at the state level in October 2013, and on November 12, 2013, the

federal magistrate judge granted the stay of the habeas proceeding.

<u>Motion for leave to file motion for new trial</u>

{¶ 32} On October 16, 2013, Gapen filed a motion for leave to file a delayed motion for a new trial with the Montgomery County Court of Common Pleas and alleged five grounds for relief:

(1) One of the jurors who was seated at his trial was biased against him and incapable of fairly deciding the case, because that juror failed to disclose information during voir dire about a crime that was committed against his neighbor;

(2) The jury was in possession of prejudicial evidence during deliberations that had never been admitted or was specifically excluded at trial;

(3) The trial judge failed to disclose evidence of constitutional violations that took place after the jury had retired to deliberate, namely that unadmitted evidence had made its way into the jury room, that the judge had impermissible communication with a juror, that an extra-judicial source of law had been relied upon by at least one juror, and that a biased juror believed that death was the only appropriate sentence for murder;

(4) One of the jurors who was seated at his trial was biased against him and incapable of fairly deciding an appropriate sentence because he would automatically vote for death as a punishment for murder;

(5) The juror who would automatically vote for death as a punishment for murder adhered to the principle of lex talionis, the "law of retaliation," and shared his beliefs with the other jurors.

{¶ 33} Following the State's opposition memo, the trial court set the matter for a

hearing, which, due to scheduling conflicts, took place over the course of four dates, spanning nearly a year (August 29, 2014 – August 14, 2015). The hearing featured testimony from many members of Gapen's defense team, including trial counsel and both state and federal public defenders involved in post-conviction and habeas proceedings.

{¶ 34} The first witness presented by Gapen was Alan Rossman, the director of the habeas unit at the Federal Public Defender's Office for the Northern District of Ohio. (All federal proceedings in this case have taken place in the Southern District of Ohio.) He testified about the federal habeas process and the interplay between state and federal courts.

{¶ 35} David Greer, Gapen's lead trial counsel, took the stand next. He testified that he learned in 2013 that excluded evidence somehow made it into the jury room for deliberations. He further explained that had he known about it at the time, he would have moved for a mistrial. Greer also stated that he filed a sentencing memo in June 2001 arguing that there was inconsistency with the life sentence recommendations for the murders of Madewell and Marshall and the death penalty recommendation for Young's killing.

{¶ 36} The court also heard testimony from Kathryn Sandford, an attorney with the Ohio Public Defender's Office who assisted with juror interviews in 2002. Specifically, Sandford stated that she was involved with the interviews of Juror M.M. and Juror R.S. She also testified that because the jurors were unwilling to sign affidavits, she completed one. Sandford acknowledged that all the interviews done by the Ohio Public Defender's Office were done without subpoenas.

{¶ 37} Dorian Hall, an investigator with the Ohio Public Defender's Office, testified

that she attended the 2002 interview of Juror D.N., and that she signed an affidavit because Juror D.N. would not. According to Hall, Juror D.N. revealed several things about his world view and human behavior, specifically his notion that if one is guilty of murder, death is the only appropriate sanction. Like Sandford before her, Hall testified that no subpoena was necessary to speak with Juror D.N.

{¶ 38} Jacob Cairns, an attorney at the Federal Public Defender's Office in Columbus, was the penultimate witness. Cairns participated in juror interviews in December 2011 and January 2012, including interviews with Juror M.M, Juror D.N., Juror H.R., Juror D.B, Juror R.S, and alternate Juror J.G. He testified that he did not use a subpoena to speak with the jurors.

{¶ 39} Finally, on August 14, 2015, William Moody testified. Moody was an assistant Ohio Public Defender and was on Gapen's original post-conviction team. He also testified that he represented Gapen on direct appeal in 2001. One of Moody's jobs during the time he represented Gapen was to interview jurors. He noted that in 2002 he interviewed Juror D.N. During that conversation, Juror D.N. had a document that Moody described as: "[I]t was like a table that would – of his issues that – sort of his world view of how he viewed our society and culture." Most of the interview, Moody said, was about theology and philosophy and how that world view impacted the case. According to Moody, Juror D.N. also mentioned that he tried to contact the trial judge in the aftermath of the verdict.

{¶ 40} At the close of testimony, Gapen's attorneys asked for written closing arguments – a request granted by the trial court. The briefing schedule, however, was quite expansive and was not completed until August 5, 2016, almost a full year after the

conclusion of the hearing.

{¶ 41} On April 29, 2020, the trial court issued a 49-page decision overruling Gapen's motion for leave to file a delayed motion for a new trial. He has filed a timely appeal.

## II. Gapen's Motion for Leave to File a Motion for New Trial

{¶ 42} In his first and second assignments of error, Gapen makes the following related claims: the trial court abused its discretion when it found that Gapen was not unavoidably prevented from discovering evidence, and it abused its discretion when it found that the delay in filing his evidence was not reasonable or sufficiently explained. We can distill his arguments down to this: the trial court abused its discretion when it overruled his motion for leave to file a delayed motion for a new trial.

{¶ 43} Crim.R. 33 states that motions for a new trial based on newly discovered evidence must be filed within 120 days of the verdict. To file a motion for a new trial after that threshold has passed, the petitioner must first file a motion for leave, demonstrating by clear and convincing proof that he or she has been unavoidably prevented from filing the motion in a timely fashion. *State v. Lenoir*, 2d Dist. Montgomery No. 26080, 2015-Ohio-1045, ¶ 14.

{¶ 44} Clear and convincing proof is the amount of proof that will produce in the mind of the trier of fact a "firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d (1954), paragraph three of the syllabus. The standard is not satisfied by a mere allegation that the defendant has been unavoidably prevented from discovering new evidence. *State v. Smith*, 2d Dist. Montgomery Nos. 21463, 22334, 2008-Ohio-6330, ¶ 59. A petitioner must submit

documents that on their face support the proposition that he was unavoidably prevented from discovering the evidence in a timely manner. *State v. Lanier*, 2d Dist. Clark No. 2009 CA 84, 2010-Ohio-2921, ¶ 16.

{¶ 45} "[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (10th Dist.1984). We have further explained the concept by stating that "a defendant fails to demonstrate he or she was unavoidably prevented from discovering new evidence when he would have discovered that information earlier had he or she exercised due diligence and some effort." *Lenoir* at ¶ 24, citing *State v. Metcalf*, 2d Dist. Montgomery No. 26101, 2015-Ohio-3507, ¶ 11.

{¶ 46} If the petitioner meets his burden, but there has been an undue delay in filing the motion after evidence was discovered, the court must then decide if the delay was "reasonable under the circumstances or that the defendant has adequately explained the reason for the delay." *State v. Stansberry*, 8th Dist. Cuyahoga No. 71004, 1997 WL 626063, *3 (Oct. 9, 1997); see also *State v. York*, 2d Dist. Greene No. 2000-CA-70, 2001-Ohio-1.

{¶ 47} We review the trial court's ruling on a motion for leave to file a delayed Crim.R. 33 motion for an abuse of discretion. *Lenoir* at ¶ 16. An abuse of discretion has been described as an attitude that is unreasonable, arbitrary, or unconscionable. *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo,

would not have found that reasoning process to be persuasive." *AAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 48} We will address Gapen's claims in a manner that facilitates our analysis.

Evidence Issues

{¶ 49} Gapen contends that several pieces of improper evidence were available to the jurors during deliberations that he did not know about. The most-cited item by Gapen is a receipt from a gun shop, an unadmitted piece of evidence. This evidence came to light in 2002 when Gapen's post-conviction counsel interviewed several jurors, including Juror M.M. In his interview, Juror M.M. told Attorney Sandford that a receipt from a gun shop was found in Gapen's wallet (an admitted exhibit) in the jury room during deliberations. The record is unclear as to how the receipt got there, but later interviews and testimony from other jurors seem to confirm its existence.

{¶ 50} Information also came to light, this time from a 2012 deposition from Juror M.F., that an envelope of Young's teeth, though excluded from evidence, allegedly made its way into the jury room during deliberations. When pressed during deposition, though, Juror D.N. did not recall seeing this excluded evidence. Further, Juror D.N., in his 2012 deposition, claimed that inflammatory pictures of Young's bedroom, bed, and teeth, which were excluded from trial, were present during deliberations.

{¶ 51} It is Gapen's argument that he was unaware of all the alleged improper evidence and could not have discovered the items sooner. Therefore, he asserts that the trial court erred when it overruled his motion for leave to file a motion for a new trial. We disagree.

{¶ 52} As to the gun receipt, it is undisputed that Gapen's legal team learned of this item in 2002 from an interview Attorney Sandford conducted with Juror M.M. And while Gapen characterizes this fact as "a passing, cryptic reference," it still put him on notice of the possibility that the evidence existed at the time of the trial. At the very least, the statement gave the defense team something to investigate further.

{¶ 53} The outcome for the other alleged improper evidence is less settled, but nevertheless compels the same conclusion. The record seems to indicate that Gapen first learned in 2012 of the possibility that an envelope containing Young's teeth and excluded photographs of the crime scenes reached the jury during deliberations. While we have no reason to believe that Gapen or his team had any idea about these alleged problems during the trial or shortly thereafter, that is only half of the standard. He must still demonstrate the second prong – that he could not have learned of the information with the exercise of reasonable diligence. *Lenoir* at ¶ 19. We agree with the trial court that Gapen has failed to meet this burden.

{¶ 54} Having been put on notice in 2002 that the potentially improper evidence was presented to the jury, it would have been reasonable for Gapen's team (he has been represented by multiple lawyers and investigators almost continuously since conviction) to inquire whether other such evidence had made it into deliberations. Gapen argues that digging deeper and asking more questions was impossible because the trial court stood in the way by denying his post-conviction discovery requests. There are, however, at least two problems with that claim.

{¶ 55} First, as we stated in one of Gapen's previous appeals in 2005, R.C. 2953.21, the post-conviction relief statute, does not grant a petitioner the right to conduct

discovery. *Gapen I* at ¶ 60. The trial court cannot be blamed for following the law. Second, a lack of compulsory discovery did not limit Gapen's team from asking follow-up questions and investigating further. Being told that you cannot subpoena is not the same as being told that you cannot interview. His team *could* have learned of the other pieces of improper evidence from following up on Juror M.M.'s revelations about the gun receipt. Even Gapen's federal habeas counsel acknowledged that information from jurors that unadmitted evidence was present during deliberations "creates a strong inference that other unadmitted but highly inflammatory trial exhibits * * * were likewise sent to the jury." Gapen's March 4, 2016 Post-Hearing Brief at 48-49. The inquiry is not just whether Gapen had knowledge of all the alleged improper evidence – he likely did not know about the teeth or photographs until 2012 – but rather if he could have learned of it. We agree with the trial court that he *could* have.

Juror Issues

{¶ 56} Gapen also argues that he was unavoidably prevented from learning about potential issues with individual jurors, specifically Jurors D.N. and M.M.

{¶ 57} As to Juror D.N., Gapen's claims "generally revolve around [the juror's] belief in, independent research about, and adherence to, principles of *Lex Talionis*, under which the only acceptable penalty upon conviction of murder is death." Appellant's brief at 23. Gapen further argues that Juror D.N. failed to disclose these beliefs in his juror questionnaire and/or in voir dire.

{¶ 58} While it is true that Juror D.N. did not use the term *Lex Talionis* in his jury questionnaire or during voir dire, Gapen should not have been blindsided by Juror D.N.'s pro-death penalty stance. His jury questionnaire made it very clear that he believed the

death penalty was "[a]ppropriate in every case where someone has been murdered." Further, when asked on the form to rate whether the death penalty should never be used as the punishment for any murder, Juror D.N. responded "strongly disagree." Similarly, when asked to rate whether the death penalty should always be used as the punishment for every murder, Juror D.N. selected "strongly agree" as his response. These responses date back to 2001. Juror D.N.'s pro-death penalty views were known to Gapen and his counsel prior to trial.

{¶ 59} Even more information was discovered in 2002 during post-conviction interviews done by Gapen's team. Investigator Hall, who interviewed Juror D.N. in 2002, confirmed during her 2012 testimony that Juror D.N. expressed the world view that "if one is guilty of murder, then death is the only appropriate sanction." Attorney Mooney, another member of the post-conviction team, described a document that Juror D.N. possessed during his 2002 interview. "[I]t was like a table * * * of his world view of how he viewed our society and culture." Mooney testified that most of their discussion was centered around theology and philosophy and how Juror D.N.'s worldview impacted the case.

{¶ 60} In September 2002, Attorney Sandford interviewed Juror M.M. Her affidavit about the conversation established that "Juror [M.M.] confirmed that while the trial was proceeding, juror [D.N.] conducted independent research into the biblical meaning of the death penalty. [Juror D.N.] shared his views with other jurors." Juror M.M. was not the only member of the jury to tell Gapen's post-conviction team about that. Juror R.S. told investigators that Juror D.N. "conducted his own outside research on the death penalty and the law and that [he] told the other jurors about his research during deliberations."

{¶ 61} A pro-death penalty worldview and the possibility of outside research on the

subject was not the only potentially problematic information about Juror D.N. that Gapen's team collected in 2001-2002. Juror D.N. informed Hall and Mooney during his 2002 interview that he had attempted to contact the trial court judge by email after the guilt phase of the trial was completed. There is no evidence in the record, however, that the judge received the email.

{¶ 62} Gapen claims that the trial court erred when it denied his motion for leave to file a motion for a new trial because he was "not aware of the full range of [Juror D.N.'s] misconduct in 2002; much of the evidence about his strict adherence to the principles of *lex talionis*, for instance, only came out in federal habeas discovery proceedings." Appellant's brief at 24. While Gapen did gain *some* new evidence from deposing Juror D.N. and from gaining some of his documents, Gapen should have been aware of potential issues relating to Juror D.N. as early as the spring of 2001 when his trial counsel received the juror questionnaires. Gapen was certainly aware in October 2002 because the entire Fourth Ground for Relief in his original post-conviction motion is based on Juror D.N. It is Gapen's burden to demonstrate that he and his team had no knowledge of the existence of the grounds supporting his motion for a new trial, but when it comes to potential issues with Juror D.N., he had actual knowledge of many of the grounds. At the very least, his team was armed with enough information to investigate further. And as stated earlier, the inquiry is not just whether Gapen had knowledge, but rather if he *could* have learned of it. We agree with the trial court that he *could* have.

{¶ 63} Gapen also raises issues with Juror M.M. Specifically, he avers that Juror M.M. was not truthful with the answers given in either the jury questionnaire or during voir dire because years later, information came to light showing that an attempted murder-

suicide took place next door to his home, on property he owned. Gapen argues that the outcome could have been different, and that Juror M.M. surely had an implicit bias because of the incident next to his house. He further contends that had this information been known at the time of the trial, Gapen's counsel could have questioned Juror M.M. about it. We disagree because the information regarding the crime is completely irrelevant to this case.

{¶ 64} Even assuming M.M.'s failure to disclose the attempted murder-suicide constituted juror misconduct that was not discovered until December 2011, Gapen's delay in filing the motion was, as explained below, neither reasonable nor adequately explained.

{¶ 65} While the details of the crime that happened on Juror M.M.'s property were horrific, it cannot be said he was a *victim* of the crime in the normal sense of the word. He did not see the attack (although he reports having seen the surviving victim afterwards), he was not physically injured by it, and there is no report that he was even financially harmed from the attempted murder-suicide. Juror M.M. had so little involvement that he did not consider himself a victim and thus, did not report the incident in his questionnaire or during voir dire. On the other hand, when he *was* a victim, he disclosed the information.

{¶ 66} Gapen makes the claim that, when asked during voir dire if anyone had ever been involved in any disputes about domestic violence, that Juror M.M. should have disclosed to counsel the incident that happened on his property. He also argues that Juror M.M. should have spoken up when the jury was asked whether any of them had witnessed someone losing control or were present when that happened with someone else. Juror M.M. reasonably did not answer either of those questions because he was not involved in domestic violence or with someone "losing control." Just because he owned the

property where a crime happened does not mean he experienced that crime in any way. Whether Juror M.M. owned property where an attempted murder-suicide took place was not relevant to this case, and we reject that argument here.

{¶ 67} Gapen also addresses potential judicial misconduct. During a 2011 interview, Juror M.M. revealed that after the trial concluded, he and a few other jurors spoke with the trial judge. During their conversation, Juror M.M. stated that the jurors informed the court about the gun receipt being present during deliberations. The court, according to Juror M.M., told the jurors that the receipt was "irrelevant." Gapen alleges that the trial court should have immediately informed counsel of the gun receipt and the failure to do so prejudiced him.

{¶ 68} While we agree that the court should have notified counsel after learning of the receipt, we find that that evidence was discoverable years earlier. Even if it was not, as we will discuss at length in the next section, there was an unreasonable delay in filing Gapen's motion for leave to file a motion for a new trial after discovering this evidence. The evidence was discovered in 2011 and the motion was not filed until 2013.

{¶ 69} Based on the evidence in the record, all the relevant issues that Gapen points to were at least *discoverable* in 2002 and could have been raised in a motion for a new trial by state post-conviction counsel. It appears, however, that Gapen and his team made the decision to file for post-conviction relief and discovery instead. Regardless of the reason, we find that Gapen had knowledge of the ground that would support a motion for a new trial or could have discovered it in the exercise of reasonable diligence approximately ten years before the motion was filed.

Unreasonable Delay

{¶ 70} Even assuming that Gapen could not have learned of the existence of the facts underlying his motion, the delay in filing the motion for leave was neither reasonable nor adequately explained.

{¶ 71} Gapen places a great deal of emphasis on the actual knowledge of his federal counsel and on the rules they were required to follow to litigate his case. He claims that his federal team did not know about the allegations until 2012 and that federal regulations did not permit the case to progress any faster than it did. The record, however, suggests otherwise.

{¶ 72} Federal counsel was appointed on August 11, 2008 to pursue federal habeas corpus relief, and the writ of habeas corpus was filed in federal court on March 10, 2009. Between the time counsel was appointed and when the writ was filed, Gapen's team spent months pouring through the state court records. We know this because Gapen cited 2002 post-conviction affidavits in the first habeas petition. Based on the information learned to that point, Gapen's federal team could have started interviewing jurors. They were put on notice of the facts that could potentially support a motion for a new trial. Gapen's state team was aware of the facts and did not file for a new trial or leave to file, and the same can be said for his federal team. Instead of starting to at least investigate immediately, they waited.

{¶ 73} On October 10, 2010, Gapen's team filed a request for discovery with the federal district court, 26 months after first being appointed. The request was granted October 31, 2010, giving them subpoena power, but Gapen's counsel did not begin its interviews until December 2011. And, federal depositions were not held until the winter and spring of 2012. Gapen's federal counsel then filed his motion for leave to file a

delayed motion for new trial in state court on October 16, 2013 – over five years after being appointed to the case and nearly two years after beginning interviews.

{¶ 74} Gapen attributes this delay to the complexities and logistics of practice in federal court. For instance, Gapen states that federal defenders are not permitted to practice in state court without permission from the district court and that there are funding restrictions on federal public defenders litigating in state court. Attorney Rossman testified that federal public defenders cannot use federal funds for state court litigation without authorization from the federal district court. Gapen also argues that it was not practical to begin speaking with jurors until he got federal subpoena power in late October 2011.

{¶ 75} While we understand that there are certain guidelines that federal public defenders must work within, the rules did not prevent them from investigating further into what they already knew.

{¶ 76} Gapen's federal team was aware in at least 2009 (from reviewing affidavits and notes of state post-conviction and trial counsel) that as soon as the penalty phase verdict was read, trial counsel, led by Attorney Greer, had suspicions that "[t]he jury, in my mind, violated its oath, and I think that was clear without any jury affidavits." Greer also raised concerns in 2001 that the verdicts were "inconsistent." By 2009, Gapen's federal team also would have been aware of potential misconduct allegations against Juror D.N. and that the jury was exposed to improper evidence during deliberations. They could have immediately interviewed or followed up with any of the jurors, but instead there was a three-year delay.

{¶ 77} Even without the discovery order, though, Gapen's team could have spoken with the jurors, and in some cases it did. Attorney Cairns testified that he interviewed

Jurors D.N. and M.M. in late 2011 and early 2012 without needing subpoenas. He also testified that he interviewed Jurors H.R. and D.B. without the use of a court order. Rossman, likewise, testified that Gapen's team would not have needed permission from the district court to talk to state court counsel or jurors.

{¶ 78} Even assuming they first learned of the underlying facts in late 2011 or early 2012, Gapen's federal team would have known that it was not possible to achieve federal habeas relief until their state claims were exhausted. *See* 28 U.S.C. §2254(b)(1)(A). But instead of asking the federal court to stay and abey the habeas petition to go back and practice in state court, Gapen continued with his habeas litigation. The "go-back" request was filed on September 30, 2013 and was granted October 8, 2013 – well over a year after Gapen claims he discovered the underlying facts.

{¶ 79} Gapen's case is similar to *Lenoir*, 2d Dist. Montgomery No. 26080, 2015-Ohio-1045. In that case, Lenoir knew in April 2012 of new evidence upon which he intended to rely in filing for a new trial. Instead of filing for a new trial, Lenoir kept litigating in federal court and delayed filing his motion for leave for over a year. We stated, "Lenoir asserts that he became aware of the telephone conversations between his sister and Peterson on April 12, 2012. Lenoir, however, did not file his motion for leave to file a motion for new trial until over a year later, on May 2, 2013. We note that in May of 2012, Lenoir was focused on pursuing a writ of habeas corpus from the federal court based on the recording of the telephone conversation. However, we cannot excuse the lengthy delay in filing the motion for leave with the trial court. * * * Lenoir did not need permission from the federal court to file his motion for leave in the trial court." *Id.* at ¶ 24.

{¶ 80} The same is the case here. Gapen could have filed his motion for leave in

state court in 2009, or in early 2012 after interviews and depositions were done. Instead, much like *Lenoir*, it appears Gapen's strategy was to play things out in federal court. It is also true, like in *Lenoir*, that Gapen's counsel did not need permission from the federal court to file his motion for leave in the trial court. Gapen's counsel admitted as much at his August 29, 2014 motion hearing when he was asked directly by the trial court.

> <u>Court</u>: There's nothing, procedurally, that if information is obtained, that, while he's involved in any habeas or federal court proceedings, that prevent him from filing something in the state court.

> <u>Counsel</u>: There would not be necessarily a literal prohibition. *** [I]f the question is literally procedurally, there's nothing.

**{¶ 81}** The trial court did not abuse its discretion in finding that the delay was unreasonable. That decision aligned with the Criminal Rules' objective of "securing the speedy and sure administration of justice and eliminating unjustifiable delay * * * by discouraging a defendant from waiting to move for leave while the evidence against him dissipates or disappears." *State v. Warren*, 2d Dist. Montgomery No. 28092, 2019-Ohio-3522. *See* Crim.R. 1(B). "Delays in presenting evidence once discovered undermine the overall objective of the criminal rules. Allowing a defendant to drag the process out while the evidence and recollections of witnesses become increasingly stale defies the very purpose of the criminal rules." *State v. McConnell*, 2d Dist. Montgomery No. 24315, 2011-Ohio-5555, ¶ 18. (Internal citations omitted).

**{¶ 82}** Gapen failed to prove that he was unavoidably prevented from discovering the grounds for his claims of alleged juror and judicial misconduct, juror bias, and consideration of unadmitted evidence. He has likewise failed to demonstrate that he acted

within a reasonable time or adequately explained the delay. Therefore, the trial court did not abuse its discretion when it overruled Gapen's motion for leave to file a delayed motion for a new trial. Gapen's first and second assignments of error are overruled.

### III. Review of the Merits

{¶ 83} In his third assignment of error, Gapen argues that the trial court erred by not fully engaging in a merit review of the evidence.

{¶ 84} We have previously stated that "[a]lthough a defendant may file his motion for a new trial along with his request for leave to file such motion, the trial court may not consider the merits of the motion for a new trial until it makes a finding of unavoidable delay." *Lanier*, 2d Dist. Clark No. 2009-CA-84, 2010-Ohio-2921, ¶ 17, citing *State v. Stevens*, 2d Dist. Montgomery Nos. 23236 & 23315, 2010-Ohio-556, ¶ 11. *Accord State v. Wilson*, 2d Dist. Montgomery No. 17515, 1999 WL 173551, *1 (March 31, 1999) ("If it is not found that the defendant was unavoidably prevented from discovering the new evidence or from filing his motion for a new trial, the trial court is precluded from considering the untimely motion.").

{¶ 85} Gapen cites a new case from the United States Court of Appeals, Sixth Circuit, *Nian v. Warden*, 994 F.3d 746 (6th Cir. 2021), to support his proposition that a decision on the merits was warranted. While there appear to be some factual similarities, we find that there are important distinctions that cut against Gapen's conclusion.

{¶ 86} In *Nian,* the defendant was accused and convicted of multiple counts of rape. Soon after the trial, however, Nian alleged (by way of a juror affidavit) that a juror had "improperly introduced extraneous information – including his criminal record and national origin – into deliberations." *Id.* at 750. After holding an evidentiary hearing on the

issue, the trial court excluded the whistle blower/juror's testimony under Evid.R. 606(B), which states: "A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented." The Sixth Circuit ultimately held that the exclusion of the juror's testimony under Evid.R. 606(B) was a constitutional error and ordered the case remanded back to the state trial court.

{¶ 87} While the factual predicates of Gapen's case and Nian are similar (a juror allegedly brought in outside information into deliberations), the procedural postures are very different. In *Nian*, the whistleblower juror alleged juror misconduct in the weeks following the verdict and Nian promptly filed a motion for a new trial – well within the time contemplated by Crim.R. 33. The court then conducted a hearing on the allegations (within a month of the conclusion of the trial) and decided on the merits of the claim.

{¶ 88} In this case, the jurors were interviewed more than a year after the trial – outside of the Crim.R. 33 timeframe – and therefore Gapen had to demonstrate that he was unavoidably prevented from filing his motion within the time limits. Only if he was successful in clearing this preliminary hurdle could the trial court in this case assess the merits. The trial court did not believe Gapen reached the required threshold and therefore did not decide on the merits. Evid.R. 606(B) has no bearing on this case. Additionally, Gapen's cited case would only be persuasive authority, at best. "[T]he decisions of federal courts constitute persuasive authority only and are not binding on this court." *State v. Prom*, 12th Dist. Butler No. CA2004-07-174, 2005-Ohio-2272, ¶ 22. We find *Nian* to be distinguishable and decline to follow it.

**{¶ 89}** Given the trial court's conclusions, it was not permitted to rule on the merits of Gapen's claims. The trial court did not err, and the assignment of error is overruled.

**IV. Conclusion**

**{¶ 90}** The trial court did not abuse its discretion when it found that Gapen failed to prove by clear and convincing evidence that he was unavoidably prevented from discovering the grounds for his claims. Likewise, the trial court did not abuse its discretion when it found Gapen had failed to demonstrate that he acted within a reasonable time or adequately explained the delay in filing his motion for leave to file a motion for a new trial. Finally, the trial court did not abuse its discretion when it did not rule on the merits of Gapen's claims. The assignments of error are overruled, and the judgment of the trial court will be affirmed.

.. . . . . . . . . . . . .

TUCKER, P. J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Allen L. Bohnert
Adam M. Rusnak
Hon. Mary Katherine Huffman